Lisa A. QUERIDO, Plaintiff,

v.

Jo Anne B. BARNHART, Commission-
er of the Social Security Adminis-
tration, Defendant.

No. CIV.A.03–11162–WGY.

United States District Court,
D. Massachusetts.

Sept. 10, 2004.

Morris Greenberg, Green & Greenberg, Providence, RI, for Lisa Querido, Plaintiff.

Michael P. Sady, United States Attorney's Office, Boston, MA, for Jo Anne B. Barnhart, Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

This action is brought under sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), and seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner"). The plaintiff, Lisa Querido ("Querido"), challenges the decision of the Administrative Law Judge to deny her Supplemental

Security Income ("SSI") and Social Security Disability Income ("SSDI") benefits. Arguing that the Administrative Law Judge's decision contained errors of law and was not supported by substantial evidence, Querido requests that this Court reverse the decision, or alternatively, remand for reconsideration. Pl.'s Mot. for Summ. J., or Alternatively, for Remand [Doc. No. 10] (filed Dec. 9, 2003); Pl.'s Mem. in Supp. [Doc. No. 11] ("Pl.'s Mem."). The Commissioner filed a cross motion to affirm the decision of the Commissioner. Def.'s Mot. for Order Aff'g the Decision of the Comm'r [Doc. No. 12] (filed Jan. 21, 2004); Def.'s Mem. in Supp. of the Decision of the Comm'r [Doc. No. 13] ("Def.'s Mem.").

## II. BACKGROUND

### A. Procedural History

Querido filed for SSI and SSDI on July 19, 2000. R. [Doc. No. 9] at 65–69, 368–74. Her application indicated that she became disabled on January 10, 2000, due to her back injury, asthma, and anxiety. *Id.* at 369. The Commissioner denied Querido's claim on September 25, 2000. *Id.* at 31–36. Upon a request for reconsideration, Querido's application was reevaluated and her claim was again denied on December 20, 2000. *Id.* at 38–41. Querido requested and was granted a hearing before an administrative law judge. *Id.* at 42. On December 28, 2001, after a hearing and a review of the evidence, the Administrative Law Judge denied Querido's claim because she had not established that she was disabled under the Social Security guidelines. *Id.* at 24. Querido petitioned the Social Security Appeals Council for a review of the Administrative Law Judge's decision, but her request was denied. *Id.* at 8–11.

Thus the Administrative Law Judge's decision constituted the final decision of the Commissioner. *Id.* at 8. On June 12, 2003, Querido filed the instant action in this Court to review the decision of the Commissioner pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B. Factual Background

At the time of the hearing on November 13, 2001, Querido was 34 years old with a high school education. R. at 393–94. She shared a first-floor apartment with a roommate. *Id.* Her daily activities included shopping, cooking, housecleaning, reading, watching television, and visiting her mother and neighbor. *Id.* at 401–03. On occasion, Querido would go for a walk or drive her car. *Id.* at 402, 406. She held a series of jobs, having worked as a delivery person, kitchen assistant, cashier, stock clerk, driver, receiver, and assistant teacher, none of them for much more than a year. *Id.* at 92, 114. Querido alleges that her asthma and anxiety caused her to miss a lot of work and that she would eventually quit her job when she felt she was about to be fired. *Id.* at 91; *see id.* at 205.

In her most recent position, Querido stocked vending machines. *Id.* at 114. At work on January 11, 2000, Querido claims to have injured her back and neck lifting a handcart filled with cases of juice and soda. *Id.* at 170. She has not returned to work since. *Id.* at 369, 395.

### 1. Medical Evidence

Querido alleges that her disability on account of asthma, anxiety, and a back injury began on January 10, 2000.[1] Her medical records indicate that she suffered from asthma and anxiety for a number of

---

1. Although the onset of the disability is identified as a day prior to her alleged work injury, the Court assumes this to be simply an error.

years prior to this date. *Id.* at 117. Querido's back pain stems from the January 11, 2000 incident of lifting a handcart at work. *Id.* at 170.

### a. Asthma

Querido has a history of asthma, for which she has been treated since at least 1995. *Id.* at 119, 222–23, 228–29, 231, 239, 345. Her asthma has largely been managed with medication, *id.* at 231, 239, 247, 314, although Querido occasionally experiences some wheezing and shortness of breath, *id.* at 247, 248. She was hospitalized once for an asthma attack in 1994 or 1995, *id.* at 299–300, 309, 312, and was a heavy smoker until 1999, *id.* at 239, 314. Querido had normal spirometry in August 2000, *id.* at 200, and normal spirometry with borderline obstruction in December 2000, *id.* at 329. In December 2000, Dr. R. Goulding found that Querido suffered from mild asthma, *id.* at 277, and should avoid concentrated exposure to extreme heat, extreme cold, dust, and fumes, *id.* at 280.

At her hearing, Querido testified that she was under the care of Dr. Goldstein for her asthma, and that she would visit him "every couple of weeks" if her breathing was bad. *Id.* at 399. When asked about her medications, Querido testified that she used an Albuterol inhaler three or four times a day, and that she has needed it less since she stopped smoking. *Id.* at 400. When asked by the Administrative Law Judge about the side-effects, Querido explained: "Well, it makes my heart go fast and zingy. I think it just makes me feel more anxious then I probably would have been before I did it but if I don't take it I can't breathe." *Id.*

### b. Anxiety

Querido has long suffered from anxiety, perhaps all her life. *Id.* at 309, 312. On August 24, 2000, Dr. Michelle Reeves, a treating physician, diagnosed Querido with anxiety disorder and found Querido "occasionally limited" by her anxiety and "slightly limited" in her ability to respond appropriately to changes in her work routine or environment. *Id.* at 300–02. Dr. Reeves observed "no limitations" in Querido's ability to remember and carry out simple tasks, to maintain attention and concentration in order to complete tasks, to make simple work-related decisions, to interact appropriately with supervisors and co-workers, and to work at a consistent pace without extraordinary supervision. *Id.* at 302. Dr. Reeves nevertheless commented that "Patient suffers from 3 chronically intermittent disorders that have frequently interfered with her ability to function in the social and occupational settings. Due to poor medical follow up in past and inability to afford medications, these conditions have not been well controlled." *Id.*

On September 14, 2000, Dr. Paul Solomon, a psychologist, diagnosed Querido with panic disorder with agoraphobia, noting that she suffered from severe anxiety, but had "not followed through in previous attempts at psychotherapy." *Id.* at 206. He rated her Global Assessment of Functioning ("GAF") at 50. *Id.* A GAF rating of 41–50 indicates "[s]erious symptoms... or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994). From his consultative examination of Querido, Dr. Solomon made the following observations:

> Ms. Querido expresses herself quite well with some pressure of speech. She is well oriented. Her memory functioning is · good for both recent and remote events. Her concentration is somewhat impaired because of her severe anxiety.

However, she was able to remember 3/3 objects after a 10-minute interval. There is no indication of any thought disorder or psychotic thinking. R. at 204–05.

On September 20, 2000, Dr. J. Burke, a state agency psychologist, also diagnosed Querido as having panic disorder with agoraphobia. *Id.* at 207, 212. Dr. Burke rated Querido's restriction of activities of daily living as "None," her difficulties in maintaining social functioning as "Mild," and her difficulties in maintaining concentration, persistence, or pace as "None." *Id.* at 217. Additionally, Dr. Burke noted that with continued sobriety and treatment, by January 2001 her impairment would not be considered severe. *Id.* at 217, 219.

On November 2, 2000, Querido visited Child and Family Services, Inc., where therapist Diane Lipstock diagnosed generalized anxiety disorder and alcohol dependence. *Id.* at 251. Ms. Lipstock assessed her current GAF rating at 45, and expected her rating to increase to 70 at discharge. *Id.* She observed that Querido's speech and thought content were normal, her judgment was good, her mood/affect was appropriate but anxious, her appearance was well groomed, her intellect was average, her behavior was cooperative, and that she was not suicidal, homicidal, phobic, or compulsive. *Id.* at 255. Ms. Lipstock did, however, note the following symptoms of anxiety: fidgety, distractible, sweating, apprehensive, excessive talk, and dizziness. *Id.* She also indicated that Querido was obsessed with death. *Id.* Overall, Ms. Lipstock indicated that Querido's coping skills were fair. *Id.* at 254. For treatment of Querido's anxiety, Ms. Lipstock appears to have recommended medical management and psychological therapy. *Id.* at 252.

On November 27, 2000, Dr. Terri Betts, a psychologist, observed during a consulta-

tive examination that Querido was well-groomed, had normal gait, posture, and motor behavior, had appropriate eye contact and fluent speech, had coherent and goal-directed thought processes, was of average intelligence, and had good insight and judgement. *Id.* at 309–10. She also observed, however, that Querido had an anxious affect and mood, that her attention and concentration appeared mildly impaired, and that her recent and remote memory skills appeared mildly impaired during the examination. *Id.* at 310. In evaluating Querido's vocational functional capacities, Dr. Betts noted:

> The claimant appears to have significant anxiety symptoms. These very likely would make it difficult for her to maintain attention and concentration for job-related tasks as well as make appropriate job-related decisions. This might also impact her ability to consistently perform job tasks. She does, however, appear to have the ability to follow and understand simple directions and instructions and perform some simple rote tasks under supervision.

*Id.* at 310–311. Dr. Betts concluded that "[i]t is possible with the management of her anxiety symptoms that the claimant would in fact be able to engage in some type of competitive work," and that Querido's "prognosis appears fair given her severe anxiety symptoms and lack of long work history." *Id.* at 311. Dr. Betts recommended that Querido consider individual psychological therapy. *Id.*

In December 2000, Dr. Edwin Davidson, a state agency psychiatrist, found that Querido's anxiety caused her "some difficulty sustaining functioning regularly and traveling consistently," but opined that "[s]he should be capable of unpressured work." *Id.* at 273. He rated Querido's restriction of activities of daily living as "Moderate," her difficulties in maintaining

social functioning as "Mild," and her difficulties in maintaining concentration, persistence, or pace as "Moderate." *Id.* at 267.

In January 2001, Dr. Guillermo Gonzalez, Querido's treating psychiatrist, diagnosed Querido with anxiety disorder, panic disorder, and social phobia, and assigned her a GAF rating of 60. *Id.* at 347, 351. A GAF rating of 51–60 indicates "[m]oderate symptoms or moderate difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994). On April 24, 2001, Dr. Gonzalez rated Querido's anxiety as "Moderately Severe" and her tension as "Moderate." R. at 352. He rated her depression, disorientation, distractibility, excitement, irritability, and motor hyperactivity as "Mild," and all other behavioral symptoms as "not present." *Id.* In a "Supplemental Questionnaire as to Residual Functional Capacity" dated May 13, 2001, Dr. Gonzalez observed "Moderate" limitations in Querido's ability to relate to others, to carry out daily activities, to understand, carry out, and remember instructions, to respond appropriately to supervision and co-workers, to respond to customary work pressures, and to perform simple, complex, repetitive, and varied tasks. *Id.* at 334–35. In a second supplemental questionnaire dated November 6, 2001, Dr. Gonzalez observed some improvement in Querido's functioning, indicating "Mild," rather than "Moderate," limitations in her ability to respond appropriately to supervision and co-workers, and to perform simple and repetitive tasks. *Id.* at 361–63.

At her hearing, the Administrative Law Judge asked Querido why she felt she was not able to work, and she responded: "I feel like I'm not because I, I honestly don't know. I just don't leave the house very much. And sometimes when I do I just go straight back home. I don't, I don't know why. I just know I can't get out." *Id.* at 397. The Administrative Law Judge then asked Querido about her anxiety medications, their side-effects, and their dosages. *Id.* at 398–99. Querido testified that she was currently taking Xanax and Wellbutrin for her anxiety, and that the Xanax made her feel "tired" and "[k]ind of . . . just out there." *Id.* at 398. She testified that Dr. Gonzalez had tried adjusting the dosage, but she felt worse without the medication. *Id.*

Querido's attorney asked her at the hearing what kind of problems she experienced at work in the past, and she replied: "I couldn't just home [sic] and I couldn't leave. I just, I don't know, I just couldn't—just being there. Like, like right now I just want to leave and I can't. It makes it very hard for me." *Id.* at 404. Querido admitted never toying with the idea of going back to work after her injury in January 2000, explaining "I just don't think I can do it." *Id.* Querido testified that the medication "helps a lot" but she "feel[s] better when [she's] at home." *Id.* at 405. Although she felt like her condition was getting worse, *id.* at 404, she never attempted to get counseling because she "never thought of it" and did not think that any of her doctors had ever suggested it, *id.* at 405.

### c. Back Pain

From January to September 2000, Querido was treated for back pain at the Family Medical Center after injuring herself at work. *Id.* at 167–203. On January 11, 2000, the day of her injury, x-rays taken of her cervical spine and obliques were normal, and Querido was diagnosed with cervical and upper thoracic strain. *Id.* at 167–68.

From January 26, 2000, to April 10, 2000, Querido underwent regular sessions of physical therapy. *Id.* at 126–46. Her pain was reduced and her function and range of motion improved, although she continued to complain of back pain, numbness in her left hand, and difficulty standing in one place. *Id.* at 129, 139, 143. On April 25, 2000, Querido's physical therapist prepared a discharge summary, noting that Querido failed to show up to her second to last physical therapy appointment on April 13, 2000 and that she never called to reschedule. *Id.* at 145.

On March 20, 2000, Dr. Thomas Antkowiak, an orthopedic surgeon, diagnosed Querido with upper back strain. *Id.* at 366–67. He concluded that "[d]espite her significant subjective complaints," including constant daily back pain, he could "find no neurologic deficit and nothing to suggest on physical examination that this is a radioulopathy of any kind." *Id.* at 365, 367. He further explained:

> I cannot really find anything significantly wrong with her at this time other than local tenderness and I do not understand why she has remained out of work. She certainly has had adequate physical therapy and does not need any further physical therapy in my opinion. She can return back to work. It may be helpful for the first week to limit her pushing and pulling to under 15 or 20 pounds, and then she should be able to return back to her normal job.

*Id.* at 367 (paragraph structure altered).

On March 30, 2000, Dr. Steven W. Medwid, interpreting Querido's MRI, made the following findings:

> There is normal overall alignment and curvature. The vertebral body heights and disc spaces appear maintained. The cervical spinal cord is not expanded and demonstrates normal signal intensity. The visualized posterior fossa structures show no significant abnormalities.

> There is some minimal central bulging at the level of C4/5. This does not cause deformity on the cervical cord. Evaluation of the remainder of the study shows no evidence of disc herniation or significant spinal stenosis.

*Id.* at 123. On December 18, 2000, Dr. R. Goulding specifically considered this MRI and concluded that Querido could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for about six hours in an eight-hour day, and sit for about six hours in an eight-hour day. *Id.* at 277–78, 283.

On November 16, 2000, Dr. Than Than Win assessed Querido's physical exam as satisfactory and recommended that she continue to take Ibuprofen for her back pain. *Id.* at 339–40. Dr. Win deemed X-rays of Querido's lumbar spine to be normal. *Id.* at 342.

On November 28, 2000, Dr. Bruce Bochman performed a physical examination of Querido and found her lumbosacral spine to be normal "except for minor limitation of straight leg raising bilaterally to 70 degrees" and "palpatory tenderness at L4–5–S1 on the right." *Id.* at 312, 314. Dr. Bochman concluded that Querido's lower back pain "appear[ed] to be one of the major factors in reducing her activity potential at this time," and that her "[a]ctivity potential is moderately reduced in the short and immediate term." *Id.* at 315. He opined, nonetheless, that Querido could possibly improve in the long-term with treatment. *Id.* Subsequent x-rays of Querido's spine taken on December 27, 2000 were deemed normal by Dr. Michael Merport, demonstrating only minimal degenerative disc disease in the mid to upper portion of the thoracic spine. *Id.* at 326.

When asked at her hearing why her last job ended, Querido responded "I hurt my neck at work and I was on—they did therapy for a few months and it's, it's good

now." *Id.* at 395. Querido then admitted to the Administrative Law Judge that she did not make any attempt to go back to work after she recovered. *Id.*

### 2. Testimony of Vocational Expert

At Querido's hearing, a vocational expert, Albert Sadella ("Sadella"), was asked by the Administrative Law Judge to consider a hypothetical claimant of Querido's age, education, and work experience, who could perform light exertional work with no concentrated exposure to dust, smoke, gases, or airborne pulmonary irritants, and who was limited by functional restrictions contained in Dr. Gonzalez's report of November 6, 2001. *Id.* at 408. In his report, Dr. Gonzalez had observed "moderate" limitations in Querido's ability to relate to others, to carry out daily activities, to understand, carry out, and remember instructions, to respond to customary work pressures, and to perform complex and varied tasks, and "mild" limitations in her ability to respond appropriately to supervision and co-workers and to perform simple and repetitive tasks. *Id.* at 361–62. The Administrative Law Judge asked the vocational expert whether this hypothetical claimant would be able to perform any of the work performed by Querido in the past. *Id.* at 409. Sadella testified that the hypothetical claimant could perform Querido's past work as a cashier, van driver, and assistant teacher on a full-time basis, and could also perform other similar types of cashiering positions. *Id.* at 409–10. Sadella further testified that there are 10,000 cashiering jobs and 10,000–15,000 retail sales jobs in the Rhode Island and southeastern Massachusetts economy. *Id.* at 409.

## III. DISCUSSION

### A. Standard of Review

Review of a Social Security disability benefit determination by this Court is limited by section 405(g) of the Social Security Act, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence exists when a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support the Commissioner's conclusion." *Musto v. Halter*, 135 F.Supp.2d 220, 225 (D.Mass.2001) (quoting *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir.1991)) (internal quotation marks omitted). The Commissioner must make credibility determinations and draw inferences from the record of evidence. *Id.* This Court must therefore affirm the Commissioner's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Services*, 819 F.2d 1, 3 (1st Cir.1987). The findings of fact of the administrative law judge, however, are not conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999).

### B. Social Security Disability Standard and the Administrative Law Judge's Decision

The Social Security Act provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A). "Thus, evidence of an impairment is not enough to warrant an award of benefits; there must also be evidence in the record that the impairment prevented the claimant from engaging in any substantial activity." *Durant v. Chater,* 906 F.Supp. 706, 711 (D.Mass.1995).

The Social Security Administration has promulgated regulations that have reduced this determination of disability to a five-step analysis. The administrative law judge must follow the sequential evaluation process set forth in sections 404.1520 and 416.920 of Title 20 of the Code of Federal Regulations to determine:

(1) whether the claimant is engaged in substantial gainful activity;

(2) whether the claimant has a severe impairment;

(3) whether the impairment meets or equals a listed impairment;

(4) whether the impairment prevents the claimant from performing past relevant work; and

(5) whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520; *accord id.* § 416.920(a).

The First Circuit has provided instruction on the application of this five-step process. *See Goodermote v. Sec'y of Health & Human Services,* 690 F.2d 5, 6–7 (1st Cir.1982). At step one, the Commissioner considers whether the claimant is currently employed; if so, the claimant is automatically considered not disabled and the process comes to an end. *Id.* at 6. If the claimant is not currently employed, the Commissioner then proceeds to step two and considers whether the claimant has a severe impairment. *Id.* A "severe impairment" is defined as an impairment "which significantly limits his or her physical or mental capacity to perform basic work-related functions." *Id.* If the Commissioner determines that the claimant does not

have an impairment of this severity, the process comes to an end; otherwise, the Commissioner proceeds to step three. *Id.* At step three, the Commissioner determines whether the claimant has an "impairment equivalent to a specific list of impairments contained in ... Appendix 1" to the Social Security Administration's regulations. *Id.* If so, the claimant is automatically found disabled and the process ends. *Id.* If not, the Commissioner goes on to step four and asks whether the claimant's impairment "prevent[s] him from performing work of the sort he has done in the past." *Id.* at 6–7. If not, the claimant is found not disabled and the process ends. *Id.* at 7. If so, the Commissioner moves on to step five and considers whether the "claimant's impairment prevent[s] him from performing other work of the sort found in the economy." *Id.* If so, the claimant is found disabled; if not, the claimant is found not disabled. *Id.* Importantly, the claimant bears the burden of proof at step four, but the Commissioner bears the burden of proof at step five. *Id.;* *see also Perkins v. Barnhart,* 266 F.Supp.2d 198, 205 (D.Mass.2003) (Neiman, M.J.). This process is the same for both SSI and SSDI payments. *See, e.g., Bazile v. Apfel,* 113 F.Supp.2d 181, 185 (D.Mass.2000).

In the instant case, the Administrative Law Judge found, with respect to step one, that Querido had not engaged in substantial gainful activity since the alleged onset of her disability. R. at 25, 27. The Administrative Law Judge then moved on to step two, and found that Querido had asthma and the mental impairment of anxiety, a combination of impairments considered "severe" pursuant to regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b). *Id.* at 26, 27. The Administrative Law Judge found, however, that Querido's back impairment was non-severe. *Id.* at 25. The Adminis-

trative Law Judge then proceeded to step three, where he concluded that Querido's impairment was not so severe as to meet or medically equal the criteria of a listed impairment. *Id.* at 26. The Administrative Law Judge then turned to step four and determined that Querido's residual functional capacity did not preclude her from performing her previous work as a cashier and van driver. *Id.* at 28. Therefore, without needing to proceed to step five, the Administrative Law Judge concluded that Querido did not suffer from a "disability" as defined in the Social Security Act and was therefore not entitled to benefits. *Id.*

## C. Querido's Challenge to the Administrative Law Judge's Opinion.

Querido argues that the Administrative Law Judge's decision contains errors of law and was not supported by substantial evidence. Pl.'s Mem. at 15. Specifically, Querido contends that the Administrative Law Judge (1) failed to consider all of the medical evidence in the record, (2) erred in his hypothetical question to the vocational expert, (3) failed to make required findings with regard to Querido's mental impairment, and (4) failed to give adequate weight to the evidence regarding Querido's subjective complaints regarding the adverse side-effects of her medications. *Id.* at 8–14. As a result, Querido argues, the Administrative Law Judge reached an erroneous conclusion about her ability to work.

### 1. Consideration of the Medical Evidence

■ Querido argues that the Administrative Law Judge failed to consider several pieces of evidence and mischaracterized one piece of evidence in particular when evaluating Querido's residual functional capacity. *See id.* at 8–11. In his decision,

the Administrative Law Judge found that Querido retained the capacity to perform light work (i.e., to lift and carry at least ten pounds on a regular basis and twenty pounds occasionally) with no concentrated exposure to dust, fumes, smoke, and gases, and that she had moderate limitations in her ability to relate to others, to understand, remember, and carry out instructions, to respond to ordinary work pressures, and to perform complex and varied tasks. R. at 28. These latter functional limitations were adopted from the November 6, 2001 report of Querido's treating psychiatrist, Dr. Gonzalez. *See id.* at 361–62, 408.

■ Although the Administrative Law Judge cannot derive his factual conclusions by ignoring evidence, *see Nguyen,* 172 F.3d at 35, he is not required to address every piece of evidence in the record:

> Courts have held that an ALJ's failure to address a specific piece or pieces of evidence did not undermine the validity of [his] conclusion, for example, when that conclusion was supported by citations to substantial medical evidence in the record and the unaddressed evidence was either cumulative of the evidence discussed by the ALJ or otherwise failed to support the claimant's position.

*Lord v. Apfel,* 114 F.Supp.2d 3, 13 (D.N.H. 2000) (citing *Nguyen,* 172 F.3d at 35, *Suarez v. Secretary of Health & Human Services,* 740 F.2d 1, 1 (1st Cir.1984), and *Dedis v. Chater,* 956 F.Supp. 45, 51 (D.Mass.1997) (Ponsor, J., adopting the report and recommendation of Neiman, M.J.)); *see also Ortiz v. Apfel,* 55 F.Supp.2d 96, 103 n. 1 (D.P.R.1999). Querido must show that the unaddressed evidence supports her position and is not cumulative of evidence discussed in the opinion, and that the decision of the Ad-

ministrative Law Judge is not supported by substantial evidence.

With respect to her mental impairments, Querido contends that the Administrative Law Judge improperly ignored Dr. Solomon's characterization of her anxiety as severe and his GAF rating of 50. Pl.'s Mem. at 9. First, like Dr. Solomon, the Administrative Law Judge *did* find Querido's anxiety severe, concluding at step two that Querido had an impairment or combination of impairments considered "severe" pursuant to regulations 20 C.F.R. §§ 404.1520(b) and 416.920(b). R. at 26, 27. It is unclear, therefore, why Querido thinks that this piece of evidence undercuts the determination of the Administrative Law Judge. Second, Dr. Solomon's GAF rating of 50 does not necessarily undermine the determination of Querido's Residual Functional Capacity. A GAF of 41–50 generically indicates "serious symptoms ... OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994). A raw GAF score of 50, without more,[2] does not give a fact finder significant insight into whether Querido can perform some type of competitive work. *See Seymore v. Apfel,* 131 F.3d 152, 1997 WL 755386, at *2 (10th Cir.1997) (tbl.) (unpublished decision) (holding as much for a GAF score of 45).[3] Since this unaddressed piece of evidence does not appreciably support Querido's position, it does not undermine the validity of the Administrative Law Judge's decision. For the same reasons, this Court also holds that Ms. Lipstock's unaddressed GAF rating of 45, *see* R. at 251, does not undermine the decision of the Administrative Law Judge.

Querido also contends that the Administrative Law Judge improperly ignored Ms. Lipstock's assessment of Querido's coping skills as "fair" and her notes regarding Querido's sweating, dizziness, excessive talk, distractibility, and anxious affect. Pl.'s Mem. at 9. Ms. Lipstock's report, however, did not suggest the degree to which any of these anxiety symptoms would impair Querido's ability to work. *See* R. at 255. Frankly, the Court can see absolutely nothing in Ms. Lipstock's observations that is at odds with the finding of the Administrative Law Judge that Querido had moderate limitations in her ability to relate to others, to understand, remember, and carry out instructions, to respond to ordinary work pressures, and to perform complex and varied tasks. Accordingly, this piece of unaddressed evidence does not undermine the decision of the Administrative Law Judge.

Next, Querido argues that the Administrative Law Judge mischaracterized Dr. Betts' statement that "it is possible with the management of her anxiety symptoms that the claimant would in fact be able to engage in some type of competitive work." Pl.'s Mem. at 9–10; *see also* R. at 311. The Administrative Law Judge stated in his decision that "Terri Betts, Psy.D. stated ... that she felt the claimant would improve with management of her anxiety symptoms." R. at 26. Querido contends that this paraphrasing makes it appear

---

2. Much of Dr. Solomon's assessment is less bleak than this GAF rating would suggest. He found that Querido "expresses herself quite well with some pressure of speech," was well-oriented, had good memory functioning for recent and remote events, and had no indication of any thought disorder or psychotic thinking. R. at 204–05. He also observed

that Querido's concentration was only "somewhat impaired because of her severe anxiety." *Id.*

3. Citation of unpublished decisions is disfavored in the Tenth Circuit. *See* 10th Cir. R. 36.3.

that Dr. Betts was certain of improvement, rather than merely stating the possibility. This Court is not convinced in the first place that the paraphrasing imbues Dr. Betts' statement with the certainty that Querido suggests. Second, even if such a mischaracterization occurred, Querido offers no reason why the difference between a "possibility" and a "certainty" in this instance would have any impact on the ultimate conclusion of the Administrative Law Judge that Querido had "not sought significant treatment to address her concerns." *Id.* The paraphrasing, therefore, does not undermine the decision of the Administrative Law Judge.

Finally, Querido argues that the Administrative Law Judge improperly ignored Dr. Betts' statement that Querido's anxiety symptoms "very likely would make it difficult for her to maintain attention and concentration for job-related tasks as well as make appropriate job-related decisions" and "might also impact her ability to consistently perform job tasks." *Id.* at 310; Pl.'s Mem. at 10. Contrary to Querido's suggestion, Dr. Betts' comments are not inconsistent with the determination that Querido had moderate limitations in her ability to relate to others, to understand, remember, and carry out instructions, to respond to ordinary work pressures, and to perform complex and varied tasks. *See* R. at 28. Furthermore, Dr. Betts' assessment of Querido's ability is cumulative of evidence cited in the decision of the Administrative Law Judge, namely Dr. Gonzalez's assessment of Querido's functional limitations. *See id.* at 26. Accordingly, Dr. Betts' unaddressed comments do not undermine the decision of the Administrative Law Judge.

It is apparent from the record that the Administrative Law Judge explicitly relied in large part on Dr. Gonzalez's November 6, 2001 assessment of Querido's functional limitations. *See id.* at 26, 361–62, 408. As this Court has explained in *Wells v. Barnhart,* 267 F.Supp.2d 138 (D.Mass.2003), the opinion of a claimant's treating source usually carries significant weight:

> Under the regulations, more weight is generally given to opinions from a claimant's treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. §§ 404.1527(d)(2). The administrative law judge is not, however, "obligated automatically to accept [the treating physician's] conclusions." *Guyton v. Apfel,* 20 F.Supp.2d 156, 167 (D.Mass. 1998). Rather, controlling weight is given if the administrative law judge finds that the "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(d)(2).

267 F.Supp.2d at 147 (alterations in original). It appears that Querido does not challenge the techniques used by Dr. Gonzalez, but rather contends that Dr. Gonzalez's report of November 6, 2001 is inconsistent with other substantial evidence. Specifically, Querido suggests that the report is inconsistent with the reports of Dr. Solomon, Ms. Lipstock, and Dr. Betts discussed above. For the same reasons discussed therein, this Court holds that Querido has not demonstrated that any of these items of evidence, either alone or together, qualify as substantial inconsistent evidence. In fact, quite the opposite is true. Much of that unaddressed evidence actually substantially supports the finding of the Administrative Law Judge that Querido suffers moderate functional limitations due to her anxiety. The Court

thus holds that the Administrative Law Judge, in determining Querido's residual functional capacity, properly relied on the functional assessments of Querido's treating psychiatrist, and that Dr. Gonzalez's November 6, 2001 report constitutes substantial evidence.

In regard to Querido's alleged back impairment, the Administrative Law Judge determined that there was "no basis for a conclusion of significant on-going limitation of functioning, the claimant's back impairment is found to be non-severe." R. at 25. Querido argues that the Administrative Law Judge, in making this determination, improperly ignored the March 30, 2000 MRI which, according to Dr. Medwid, showed "some minimal central bulging at the level of C4/5." *Id.* at 123; Pl.'s Mem. at 10. This piece of evidence does not appreciably support Querido's position, nor does it undermine the conclusion of the Administrative Law Judge that Querido could meet the demands of light exertional work. Nothing in Dr. Medwid's assessment or anywhere else in the record suggests that minimal bulging would cause any significant functional limitations. Dr. Medwid noted in his report that the minimal bulging "d[id] not cause deformity on the cervical cord," and concluded that Querido's spine, in all other respects, was normal. R. at 123. Moreover, after specifically considering this MRI, Dr. Goulding concluded that Querido could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for about 6 hours in an 8 hour day, and sit for about 6 hours in an 8 hour day. *Id.* at 277–78. Finally, the most recent x-ray of Querido's spine taken in December 27, 2000, cited by the Administrative Law Judge in his decision, did not show a bulging annulus. *Id.* at 25; *see id.* at 326. The unaddressed MRI, therefore, does not undermine the determination of the Administrative Law Judge that Querido's back impairment was non-severe and did not significantly limit her functional capacity.

Querido next complains that the Administrative Law Judge did not mention in his decision that she had been treated at the Family Medial Center in 2000 for back strain. Pl.'s Mem. at 10. The treatment notes from those visits show that Querido complained of persistent back pain, even after physical therapy. R. at 198 (report dated Aug. 24, 2000). This piece of evidence is merely cumulative of evidence discussed in the decision. Indeed, the Administrative Law Judge acknowledged at the outset that "the claimant ... complains of chronic back pain." *Id.* at 25. He went on explicitly to cite Dr. Amkowiak's examination, *id.,* in which Dr. Amkowiak recognized Querido's "significant subjective complaints" of daily back pain, *id.* at 365, 367. Given that Querido's complaints of back pain were acknowledged by the Administrative Law Judge, and that the Family Medical Center reports contain no information that would undermine the Administrative Law Judge's conclusions that Querido's back impairment was non-severe and that Querido could perform light work, the treatment notes are cumulative and do not appreciably support Querido's position.

Finally, Querido argues that the Administrative Law Judge improperly ignored Dr. Bochman's physical evaluation. Pl.'s Mem. at 10. Dr. Bochman found Querido's spine to be normal, noting only "minor limitation of straight leg raising" and some "palpatory tenderness." R. at 314. He concluded that Querido's lower back pain moderately reduced her activity potential in the short and immediate term, but opined, nonetheless, that Querido could possibly improve in the long-term with treatment. *Id.* at 315. It does not appear from the record that Querido sought any further treatment after her meeting with

Dr. Bochman in November 2001, but screening notes from an April 12, 2001 visit to the Greater New Bedford Community Health Center state that Querido's "[b]ack pain is stable," *id.* at 345, and Querido herself testified at her hearing that "I hurt my neck at work and . . . they did therapy for a few months and . . . it's good now," *id.* at 395. Viewing Dr. Bochman's assessment by itself and in the context of the rest of the record, this Court is not persuaded that the report supports Querido's position that her back impairment is severe and that she cannot perform light work. Even if this Court were to ignore the April 2001 screening and Querido's own testimony on the subject, the moderate reduction in activity potential contemplated by Dr. Bochman would still be consistent with Querido's capacity to do light work. Accordingly, Dr. Bochman's unaddressed report does not appreciably support Querido's position.

Overall, the determination of the Administrative Law Judge that Querido had no significant on-going limitation of functioning, despite her complaints of pain, and that Querido's back impairment was non-severe, is supported by substantial evidence. Nothing in the record, including the treatment notes from the Family Medical Center, suggests that Querido's back impairment was severe. *See id.* at 167–203. X-rays of Querido's spine taken in January, November, and December 2000 were essentially normal, *id.* at 167–68, 326, 342, as was the MRI taken in March 2000, *id.* at 123. Dr. Antkowiak opined that Querido was physically able to return to her normal work, cautioning only that for the first week she should limit herself to pushing and pulling under 15–20 pounds.

*Id.* at 367. Dr. Goulding opined that Querido could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for about 6 hours in an 8 hour day, and sit for about 6 hours in an 8 hour day. *Id.* at 277. Dr. Win assessed his physical exam of Querido as satisfactory, *id.* at 339, and Dr. Bochman found Querido's spine to be essentially normal, *id.* at 314. Querido underwent three months of physical therapy, had been recommended Ibuprophen and Motrin for pain management, and has herself admitted some improvement with treatment. *Id.* at 126–46, 178, 180, 187, 339, 345. The Court rules that the record in this case substantially supports the assessment of the Administrative Law Judge as to Querido's back impairment and her capacity to work.

## 2. Hypothetical Question to the Vocational Expert

■ Querido next argues that the Administrative Law Judge erred in his hypothetical question to the vocational expert because he had the expert consider only the limitations assessed in Dr. Gonzalez's November 6, 2001 report, rather than the limitations assessed in Dr. Gonzalez's May 13, 2001 report and Dr. Betts' November 27, 2000 report as well.[4] Pl.'s Mem. at 11–12. As previously discussed, Dr. Betts observed that Querido's attention and concentration and her recent and remote memory skills appeared mildly impaired during the examination. R. at 310. In evaluating Querido's vocational functional capacities, Dr. Betts noted that Querido's anxiety symptoms "very likely would make it difficult for her to maintain attention and concentration for job-related tasks as

---

4. Querido also contends that the Administrative Law Judge erred in not having the vocational expert consider Ms. Lipstock and Dr. Solomon's GAF ratings. As discussed in section II.C.1. *supra,* a raw GAF score, without

more, does not give a fact finder significant insight into whether a claimant can perform some type of competitive work. The Court, therefore, considers Querido's argument regarding the GAF ratings to be without merit.

well as make appropriate job-related decisions" and that "[t]his might also impact her ability to consistently perform job tasks." *Id.* Dr. Betts stated, however, that Querido "appear[s] to have the ability to follow and understand simple directions and instructions and perform some simple rote tasks under supervision." *Id.* at 310–11. Dr. Gonzalez's report dated May 13, 2001 observed "Moderate" limitations in Querido's ability to relate to others, to carry out daily activities, to understand, carry out, and remember instructions, to respond appropriately to supervision and co-workers, to respond to customary work pressures, and to perform simple, complex, repetitive, and varied tasks. *Id.* at 334–35. On November 6, 2001, Dr. Gonzalez upgraded Querido's limitations to from "Moderate" to "Mild" in the following areas: her ability to respond appropriately to supervision and co-workers, and her ability to perform simple and repetitive tasks. *Id.* at 361–62. The Administrative Law Judge based his assessment of Querido's residual functional capacity in large part on Dr. Gonzalez's November 2001 report.

■ In order to rely on a vocational expert's testimony, an administrative law judge must base her hypothetical on a substantially supported assessment of the claimant's functional limitations. *See Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994). As this Court has already held in section III.C.1, *supra,* the assessment of the Administrative Law Judge as to Querido's residual functional capacity is supported by substantial evidence in the record.

In relying on Dr. Gonzalez's most recent assessment of Querido's functional limitations, the Administrative Law Judge reasonably could have assumed that Querido had improved with treatment between the months of May and November, and thus reasonably could disregard the earlier May report. Similarly, it would have been equally reasonable for the Administrative Law Judge to assume that Querido had improved during the year between Dr. Betts' November 2000 report and Dr. Gonzalez's November 2001 report, especially since Dr. Betts' had suggested that Querido might improve with treatment. *See* R. at 311. As for Dr. Betts' assessment in particular, nothing in her comments is actually inconsistent with Dr. Gonzalez's determination that Querido had moderate limitations in her ability to relate to others, to understand, remember, and carry out instructions, to respond to ordinary work pressures, and to perform complex and varied tasks, and mild limitations in her ability to respond appropriately to supervision and co-workers, and to perform simple and repetitive tasks. *See id.* at 361–62. Attention, concentration, and consistency—the qualities noted by Dr. Betts—likely factored into Dr. Gonzalez's calculus of Querido's ability to understand, remember, and carry out instructions, to respond to ordinary work pressures, and to perform different tasks. All things considered, the Administrative Law Judge reasonably excluded Dr. Betts' assessment and Dr.'s Gonzalez's May report from his hypothetical question to the vocational expert. There was no error.

### 3. Rating Querido's Mental Impairment

■ Querido contends that the Administrative Law Judge failed to make specific findings with respect to Querido's mental impairment as required by the relevant regulations. Pl.'s Mem. at 12. 20 C.F.R. § 416.920a requires an administrative law judge to evaluate the severity of an applicant's mental impairment by following a "special technique." Under this technique, the administrative law judge must first evaluate the "pertinent symptoms, signs, and laboratory findings to determine

whether [the applicant] ha[s] a medically determinable mental impairment" and must "then rate the degree of functional limitation resulting from the impairment" in four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 416.920a(b)-(c). The regulations require the administrative law judge to "rate the degree of limitation in the first three functional areas . . . us[ing] the following five-point scale: None, mild, moderate, marked, and extreme," and "the degree of limitation in the fourth functional area . . . us[ing] the following four-point scale: None, one or two, three, four or more." *Id.* § 416.920a(c)(4). "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." *Id.*

After the administrative law judge rates the degree of functional limitation, she is to determine the severity of the mental impairment. *Id.* § 416.920a(d). If she determines that the mental impairment is severe, she "must then determine if it meets or is equivalent in severity to a listed mental disorder . . . by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." *Id.* § 416.920a(d)(2). Finally, if the administrative law judge finds that the claimant has a severe mental impairment that neither meets nor is equivalent in severity to any listing, she must then assess the claimant's residual functional capacity. *Id.* § 416.920a(d)(3). The regulations require that the administrative law judge document the application of this special technique in her decision. *Id.* § 416.920a(e).

In the instant case, the Administrative Law Judge determined at step two that the medical evidence indicated that Queri-

do has asthma and the mental impairment of anxiety and that these impairments are severe. R. at 26. At step three, the Administrative Law Judge determined that Querido's impairments were not severe enough to meet or medically equal one of the listed impairments in section 12.04 of Appendix 1 in Subpart P. *Id.* After determining that Querido's asthma and anxiety were severe, but not the equivalent of a listed impairment, the Administrative Law Judge went on to determine Querido's physical and mental residual functional capacity. *Id.*

Querido argues that the decision of the Administrative Law Judge should be reversed and remanded because he failed to rate her mental impairment in any of the required functional areas (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). Pl.'s Mem. at 12. The Court concedes that the Administrative Law Judge did not explicitly list in his decision the four functional areas specified in the regulations and his corresponding ratings. However, the decision of the Administrative Law Judge does state that "the claimant has a moderate decrease in the ability to relate with others, understand, remember and carry out instructions, perform complex and varied tasks, and respond to ordinary work pressures." R. at 27. The decision further states that Querido "has essentially routine daily activities, including shopping, housecleaning, reading and watching television." *Id.* at 26. Finally, the decision credits the conclusion of Querido's "own treating physician [who] notes only mild or moderate limitations due to anxiety." *Id.* Although the Administrative Law Judge made these findings in regards to Querido's residual functional capacity, they are sufficient to provide the required ratings in the three functional areas of activities of daily liv-

ing,[5] social functioning,[6] and concentration, persistence, or pace.[7] *See Arruda v. Barnhart*, 314 F.Supp.2d 52, 79–80 (D.Mass.2004) (Bowler, M.J.); *see also Molina v. Massanari*, No. 01–103–B, 2001 WL 1502587, at *7 (D.Me. Nov. 26, 2001).

The findings as to Querido's daily activities, social functioning, and concentration, persistence, or pace are supported by substantial evidence in the record. Querido testified at her hearing that her daily activities included watching television, cleaning her house, taking a shower, and cooking. R. at 401–02. She also stated that she would occasionally drive her car, go for a walk, wash her clothes at the laundromat, go food shopping, visit her mother's home, and socialize with her neighbor. *Id.* at 402–03. Although Querido testified that her impairments made it too hard for her to work, *see id.* at 404, the Administrative Law Judge determined that "[r]eview of the entire record supports a conclusion that the claimant is not fully credible regarding the degree to which her impairments limit her ability to work" and emphasized that Querido had declined to seek counseling for her panic attacks, *id.* at 26.

The findings also comport with the ratings provided in the two Psychiatric Review Technique Forms ("PRTF") contained in the record. *Id.* 217, 267. Dr. Burke, a psychologist, rated Querido's restriction of activities of daily living as "None," her difficulties in maintaining so-

cial functioning as "Mild," and her difficulties in maintaining concentration, persistence, or pace as "None." *Id.* at 217. Dr. Davidson, a psychiatrist, rated Querido's restriction of activities of daily living as "Moderate," her difficulties in maintaining social functioning as "Mild," and her difficulties in maintaining concentration, persistence, or pace as "Moderate." *Id.* at 267.

In addition, although Dr. Gonzalez determined in April of 2001 that Querido's anxiety was "Moderately Severe," he rated her depression, disorientation, distractibility, excitement, irritability, and motor hyperactivity as "Mild" and her tension as "Moderate." *Id.* at 352. He indicated that all other symptoms of mental impairment were "Not Present." *Id.* In May 2001, Dr. Gonzalez rated the impairment of Querido's ability to relate to others and to carry out daily activities as "Moderate." *Id.* at 334. He also observed "Moderate" limitations in Querido's ability to understand, carry out, and remember instructions, to respond appropriately to supervision and co-workers, to respond to customary work pressures, and to perform simple, complex, repetitive, and varied tasks. *Id.* at 334–35. In November of 2001, Dr. Gonzalez noted some improvement, indicating "Mild," rather than "Moderate," limitations in Querido's ability to respond appropriately to supervision and co-workers, and to perform simple and repetitive tasks. *Id.* at 361–62.

---

**5.** "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Part 404, Subpart P. App. 1, § 12.00(C)(1).

**6.** "Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the

ability to get along with others ...." 20 C.F.R. Part 404, Subpart P. App. 1, § 12.00(C)(2).

**7.** "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Part 404, Subpart P. App. 1, § 12.00(C)(3).

Other health care professionals have come to similar evaluations of Querido's abilities. On August 24, 2000, Dr. Reeves assessed that Querido's daily living activities were "occasionally limited" by her anxiety and that she was "slightly limited" in her ability to respond appropriately to changes in her work routine or environment. *Id.* At 301–02. Dr. Reeves noted "no limitations" in Querido's ability to remember and carry out simple tasks, to maintain attention and concentration in order to complete tasks, to make simple work-related decisions, to interact appropriately with supervisors and co-workers, and to work at a consistent pace without extraordinary supervision. *Id.* at 302. Dr. Reeves added, however, that Querido's use of Xanax would "moderately limit the above due to potential sedation." *Id.* On September 14, 2000, Dr. Solomon indicated that Querido's anxiety was severe, yet noted that Querido "expresses herself quite well with some pressure of speech," "is well oriented," has a good memory of both recent and remote events, and has only "somewhat impaired" concentration. *Id.* at 204–05. On November 27, 2000, Dr. Betts observed that although Querido "appear[ed] to have significant anxiety symptoms" that "would make it difficult for her to maintain attention and concentration for job-related tasks as well as make appropriate job-related decisions ... [and] consistently perform job tasks," Querido "appear[ed] to have the ability to follow and understand simple directions and instructions and perform some simple rote tasks under supervision." *Id.* at 310–11. Overall, these mental health evaluations provide substantial evidence for the assessment by the Administrative Law Judge of the degree to which Querido's mental impairment interferes with her activities of daily living, social functioning, and concentra-

tion, persistence, or pace. The Court is satisfied that the Administrative Law Judge properly evaluated Querido's mental impairment in these three functional areas.

Nevertheless, Querido is correct to point out that the Administrative Law Judge made no rating as to episodes of decompensation, the fourth and final functional area specified by 20 C.F.R. §§ 416.920a(c). "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Part 404, Subpart P. App. 1, § 12.00(C)(4). Though Querido has regularly complained of "panic attacks," there is little in the record to indicate whether any of these alleged attacks qualifies as an episode of decompensation. Although Dr. Davidson rated Querido's episodes of decompensation as "One or Two" in his PRTF,[8] R. at 267, this rating does not "represent[ ] a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 416.920a(c)(4). In fact, nowhere in the record does a medical or mental health professional suggest that Querido has had "four or more" episodes of decompensation, the rating which the regulations deem incompatible with the ability to do any work. *See id.* Given this dearth of evidence on the issue, it is not surprising that the Administrative Law Judge made no findings as to episodes of decompensation in his decision.

On review of the entire record, including Querido's own testimony on the subject, *see* R. at 405, the Administrative Law Judge did, however, express in his decision that, other than obtaining medication for

---

8. Dr. Burke did not rate Querido's episodes of    decompensation in his PRTF. R. at 217.

her anxiety, Querido "has not sought significant treatment to address her concerns." *Id.* at 26. Specifically, the Administrative Law Judge referred to Dr. Betts' report, *id.*, in which she recommended that Querido "consider the idea of conjunctive individual psychological therapy," in addition to medication, and gave Querido a prognosis of "fair," *id.* at 311. The implication in the findings of the Administrative Law Judge is that Querido had not been managing the symptoms of her anxiety as recommended, and that with proper treatment, including therapy, she could possibly improve.

This Court is essentially presented at this point with the question of whether it should grant Querido's request for remand for the simple reason that the Administrative Law Judge's decision did not include a rating of Querido's episodes of decompensation, as required by 20 C.F.R. § 416.920a(e)(2).[9] *See* Pl.'s Mem. at 12. Such a remedy is not warranted here. Given the lack of evidence in the record regarding episodes of decompensation and Querido's decision not to follow through on psychological therapy, this Court holds that the error in not rating Querido's episodes of decompensation in the decision of the Administrative Law Judge is not sufficiently significant to merit remand. Under these circumstances, a correction of this error would not alter the determination at step two that Querido's anxiety was severe or the determination at step three that Querido's anxiety was not sufficiently severe to meet or medically equal a listed mental disorder. Of course, this Court obeys the First Circuit's direction that "if an *essential* factual issue has not been resolved, ... and there is no clear entitle-ment to benefits, the court must remand for further proceedings." *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir.2001) (emphasis added). Upon review of the record in this particular case, however, the Court concludes that the rating for episodes of decompensation is not an "essential factual issue" meriting remand. *See Arruda*, 314 F.Supp.2d at 81 ("Inclusion of the rating for episodes of decompensation in the decision is not an 'essential factual issue,' however, particularly where there is insufficient evidence in the record regarding this functional limitation." (quoting *Seavey*, 276 F.3d at 11)); *see also Torres v. Barnhart*, 249 F.Supp.2d 83, 97 (D.Mass.2003) (Collings, M.J.) (affirming the denial of benefits despite the fact that the administrative law judge made no findings or ratings on episodes of decompensation where no evidence was offered of such episodes).

For all of the reasons set forth above, the Court is satisfied that the findings of the Administrative Law Judge as to the severity of Querido's mental impairment are supported by substantial evidence.

### 4. Assessment of Querido's Subjective Complaints and the Side–Effects of her Medications

■ In cases such as Querido's, where it is determined at steps two and three that a claimant has a severe impairment or combination of impairments that is not so severe as to meet or medically equal the criteria of a listed impairment, the administrative law judge, proceeding to steps four and five, "must consider the impact of related symptoms, including pain, on the claimant's residual functional capacity." *Bazile*, 113 F.Supp.2d at 185 (citing 20 C.F.R. § 404.1529(d)(4)). In *Avery v. Sec-*

---

9. Querido does not attempt to put forth an argument that there is evidence in the record to support a rating of "four or more" episodes of decompensation. *See* Pl.'s Mem. at 12.

Even if she had, such an argument would be exceedingly difficult to make given the insufficient medical evidence on the issue.

*retary of Health & Human Services*, 797 F.2d 19 (1st Cir.1986), the First Circuit established that "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." *Dupuis v. Sec'y of Health & Human Services*, 869 F.2d 622, 623 (1st Cir.1989). In evaluating a claimants subjective complaints of pain, *Avery* instructs the administrative law judge to consider six factors:

(1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

(2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

(3) *Type, dosage, effectiveness, and adverse side-effects of any pain medication;*

(4) Treatment, other than medication, for relief of pain;

(5) Functional restrictions; and

(6) The claimant's daily activities.

*Avery*, 797 F.2d at 29 (emphasis added). If an administrative law judge determines that the claimant is not credible, this finding "must be supported by substantial evidence and the [administrative law judge] must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant." *Da Rosa v. Sec'y of Health & Human Services*, 803 F.2d 24, 26 (1st Cir.1986).

In the instant case, Querido argues that the Administrative Law Judge improperly evaluated her subjective complaints regarding the side-effects of her anxiety and asthma medications.[10] Pl.'s Mem. at 14. Querido further contends that the Administrative Law Judge failed adequately to support his determination that Querido

was "not fully credible regarding the degree to which her impairments limit her ability to work." R. at 26; *see also* Pl.'s Mem. at 14. Upon review of the record, the Court disagrees with Querido's argument on both counts.

At the hearing, the Administrative Law Judge sufficiently inquired as to the type, dosage, effectiveness, and adverse side-effects of Querido's anxiety and asthma medication:

Q: All right. Are you seeing Dr. Gonzales?

A: Yes.

Q: How long have you been seeing him?

A: Maybe eight months, six months. I don't know exactly.

Q: You taking Xanax?

A: Yes.

Q: Anything else for anxiety?

A: Wellbutrin right now. He changes those a lot.

Q: And your attorney suggested that the Xanax affects your, your alertness?

A: Yes.

Q: Tell, tell me what you experience as a side affect of Xanax?

A: I just get tired. Kind of feel just out there, just [tired] I guess.

Q: Have you talked to Dr. Gonzales about how it makes you feel?

A: Yes.

Q: And is he—

A: It's better then having anxiety so I wouldn't want to—

Q: Has he—

A: —stop it.

Q: —tried to adjust the dose at all?

A: Yes, he—

---

10. Although Querido's challenge does not involve pain medication, the Court nonetheless looks to the factors in *Avery* for guidance.

Q:   How, how is the dosage adjusted?

A:   He just had to actually go up.  I used to take the pink ones, now I take the blue ones.  But I don't want him to stop because then I feel worse.

Q:   Do you know what you're taking now?

A:   Yes.

Q:   What, how much?

A:   One milligram in the morning and one at night.  And sometimes, not every day, I might take one in the afternoon or something, not all the time.

.    .    .    .    .

Q:   Okay. And you are taking inhalers?

A:   Yes.

Q:   Albuterol, anything else?

A:   Zasone [phonetic].

Q:   How often do you take the Albuterol?

A:   Four times a day, two puffs four times a day.

Q:   When you need—

A:   Within—

Q:   —it or on a regular—

A:   —within the last—

Q:   —schedule?

A:   —within the last six months sometimes I only take it three times a day.  I quit smoking so I think that helped but I don't have to take it quite as much.  I have to take it—

Q:   Do you take it on a—

A:   —in the morning—

Q:   —scheduled basis or do you—

A:   I take it—

Q:   —feel like you—

A:   —when I need it.  I can't lay down at night without it because that's, the morning and night is the two worst when I lay down.

Q:   And that makes you feel more anxious?

A:   Well, it makes my heart go fast and zingy.  I think it just makes me feel more anxious then I probably would have been before I did it but if I don't take it I can't breathe.

R. at 397–400.  When asked by the Administrative Law Judge whether she would sleep during the day, Querido responded that she did not generally sleep very much unless she takes one of her Xanax.  *Id.* at 403.  Aside from the Xanax, Wellbutrin, and Albuterol, the Administrative Law Judge also asked about all of the other medicines Querido was taking as well.  *Id.*

Although the Administrative Law Judge did not explicitly mention Querido's medications in his decision, he did appear to consider their adverse side-effects on Querido's daily activities, noting that Querido's "anxiety makes her sleepy so she is frequently fatigued throughout the day" and that "[s]he frequently has no energy or motivation and feels she should spend the day in bed."  *Id.* at 26.  In his decision, the Administrative Law Judge also cited Dr. Gonzalez's assessment that Querido only had "mild to moderate limitations with the use of medication to control her symptoms."  *Id.* At the hearing, the Administrative Law Judge specifically asked Querido whether she had informed Dr. Gonzalez, her treating psychiatrist, about the side effects of her anxiety medications, and she replied that she had.  *Id.* at 398.  The Administrative Law Judge reasonably could have assumed, therefore, that Dr. Gonzalez considered these side-effects in his assessment of Querido's functional limitations.  Overall, this Court is satisfied that the Administrative Law Judge sufficiently inquired as to the adverse side-effects of Querido's medications and adequately considered them when determining her residual functional capacity.

 The Administrative Law Judge based his assessment concerning Querido's functional limitations in part on his finding that Querido was not fully credible regarding the extent to which her impairments limited her ability to work. *Id.* at 26. In making this finding, the Administrative Law Judge stressed the fact that Querido's own treating source, Dr. Gonzalez, assessed *only mild to moderate functional* limitations due to anxiety. *Id.* In addition, the Administrative Law Judge did not find Querido altogether credible because "she receives appropriate treatment for asthma and has declined to seek counseling services for her panic attacks." *Id.* Although Querido testified that she had not sought counseling because no one had ever suggested it and she had "never thought of it," *id.* at 405, the record clearly shows that both Ms. Lipstock and Dr. Betts recommended that she seek counseling, *id.* at 252, 311. The Administrative Law Judge also explicitly based his credibility finding on his review of Querido's daily activities. *Id.* at 26. He concluded that Querido "has essentially routine daily activities, including shopping, housecleaning, reading and watching television." *Id.* These activities are well-supported by substantial evidence in the record, including Querido's own testimony at her hearing. *See, e.g., id.* at 401–03. Given the evidence before him, the Administrative Law Judge reasonably could have concluded that the extent of Querido's daily activities undermines her claim of total disability.

Overall, the decision of the Administrative Law Judge included specific findings as to why he doubted Querido's credibility, and those findings are supported by substantial evidence in the record. This Court, therefore, declines Querido's request for remand.

## IV. CONCLUSION

Accordingly, Querido's Motion for Summary Judgment, or Alternatively, for Remand [Doc. No. 10] is DENIED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 12] is ALLOWED.

SO ORDERED.