**Donald ROBERT, Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of the Social Security Administration, Defendant.**

**Civil Action No. 09–30054–KPN.**

United States District Court,
D. Massachusetts.

Feb. 25, 2010.

---

David P. Engle, Northampton, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

## MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION TO REVERSE OR REMAND AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 13 and 16)

NEIMAN, United States Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3). Donald Robert ("Plaintiff") asserts that the Commissioner's decision denying him such benefits-memorialized in a November 5, 2008 decision of an administrative law judge-is in error. He has filed a motion to reverse and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been assigned to the undersigned for all purposes, including entry of judgment. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73(b). For the reasons that follow, Plaintiff's motion will be denied and the Commissioner's motion to affirm will be allowed.

### I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales,*

402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

■ The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter … a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff, presently age forty-three, previously worked as a maintenance man (for a local Housing Authority and Wal–Mart), a tow-truck operator, a rubbish collector, and a construction laborer. (Administrative Record ("A.R.") at 230.) Plaintiff stopped working on October 31, 2005, when he went to jail; he was released from jail on January 13, 2007. (A.R. at 42.) The next section briefly traces Plaintiff's medical and psychological background as well as the procedural history of this case.

### A. *Medical Background*

On October 23, 2005, an MRI showed a medial meniscus tear in Plaintiff's left knee, which Plaintiff described as causing pain with any kind of movement, including walking and standing. (A.R. at 279, 281.) On October 31, 2005, Plaintiff indicated to the jail facility that he had undergone surgery on his left knee, had torn ligaments in his right knee, and had been prescribed Percocet; he denied any mental health problems. (A.R. at 283.) While still incarcerated, Plaintiff advised that he suffered from severe headaches, which were eased with medication. (A.R. at 301–04.)

On March 27, 2007—two and one-half months after his release and approximately one month after he applied for SSDI and SSI benefits—Plaintiff was seen at Hampshire Orthopedics & Sports Medicine for left leg pain. (A.R. at 348.) Plaintiff was found to have tenderness over his ankle and slightly positive straight leg raising, but showed an excellent range of motion in his ankle and a painless range of motion in his knee. (*Id.*) X-rays of Plaintiff's knee and ankle revealed no boney pathology; Dr. Jonathan Kurtis's impression was that Plaintiff's symptoms were "neuropathic." (*Id.*)

On April 9, 2007, Dr. Malin Weeratne, a state agency physician, reviewed Plaintiff's medical records. (A.R. at 318–24.) In sum, he concluded that Plaintiff could lift and/or carry up to fifty pounds occasionally and up to twenty-five pounds frequently; sit, stand, and/or walk for a total of six hours in an eight-hour day; occasionally climb and frequently balance, stoop, kneel, crouch, and crawl; but that he should avoid concentrated exposure to hazards.

The next and only significant medical activity occurred many months later. On January 10, 2008, Plaintiff complained of left ankle pain that had existed for two and one-half years and he was diagnosed with Achilles bursitis or tendinitis. (A.R. at 420.)

B. *Psychological Background*

After being released from jail, Plaintiff also visited the Valley Medical Group where he complained of depression and anxiety. (A.R. at 273.) On May 3, 2007, Dr. Jon Perlman, a state agency psychologist, found that Plaintiff was capable of understanding, remembering, and completing simple, routine one to two step tasks; relating in a socially appropriate manner; and had no limitations on his ability to adapt to a work setting. (A.R. at 339–41.)

On May 23, 2007, Plaintiff indicated to John Talbot, a mental health clinician, that he suffered from anxiety and had trouble sleeping. (A.R. at 345.) The medical record indicates that Plaintiff was verbal, cooperative and easy to engage with good eye contact, fair insight and judgment and intact cognitive abilities. (A.R. at 346.) Plaintiff was diagnosed with depression and possible PTSD, prescribed seroquel and fluoxetine, and assigned a Global Assessment of Functioning ("GAF") score of 55. (A.R. at 347.) [1]

Plaintiff's mental health improved with medication and on July 11, 2007, he indicated that he was sleeping better and getting along with others. (A.R. at 343.) During the remainder of that month, however, Plaintiff reported having nightmares, being depressed, and having difficulty trusting people. (See A.R. at 406–11.) Plaintiff's counselor advised that he had shown an ability to move forward and make changes in his life and should work on keeping himself busy. (*Id.*) Plaintiff's diagnoses remained depression and PTSD, with a GAF score of 50. (*Id.*)

In early August of 2007, Plaintiff reported being anxious, with difficulty getting through each week, and that he did not feel he could work. (A.R. at 405.) Later in the month, Plaintiff reported decreased symptoms and that he was busy working with his landlord; his counselor at the time noted significant progress and encouraged social activity. (A.R. at 393–404.) The following month, Plaintiff reported increased stress related to child custody issues but, by the end of the month, was making progress. (A.R. at 385–392.) Treatment notes dated October 25, 2007, reflect continued complaints of depression, stress and difficulty sleeping. (A.R. at 382–83.) Still, Plaintiff reported that he was working limited hours for his landlord and wanted to "get his name cleared" so that he could return to his job as a firefighter. (*Id.*).[2]

In November, Plaintiff's counselor noted that Plaintiff had found ways to effectively navigate various systems and was caring for his children. (A.R. at 378–81.) A treatment note dated December 24, 2007, indicates that Plaintiff's anxiety was moderate and that he was alert, oriented and well-kempt. (A.R. at 376–77.) From January 21 through April of 2008, Plaintiff reported intermittent good and bad days and continued to complain of depression, anxiety, obsessive symptoms and occasional nightmares; he advised his counselor that he felt unable to work due to his condition. (A.R. at 349–75.)

C. *Procedural History*

On February 16, 2007, Plaintiff applied for SSDI and SSI benefits, alleging that he

---

1. A GAF score of 51–60 indicates moderate symptoms of impairment while a GAF score of 41–50 indicates serious symptoms. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed., Text Revised 2000).

2. Although Plaintiff did not list such employment in his application (A.R. at 270), he testified that he had been a "call firefighter." (A.R. at 98.)

had been disabled since October 31, 2005, due to post traumatic stress disorder ("PTSD"), depression, knee pain, and difficulty concentrating. (A.R. at 174–88, 207.) Plaintiff's applications were denied both initially and upon renew. (A.R. at 142–43, 154–59.)

At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on May 19, 2008, at the end of which the ALJ expressed his intent to find Plaintiff disabled and "put [him] on [benefits] for a year and a half." (A.R. at 127.) Before issuing a written decision, however, the ALJ received a report dated July 1, 2008, from the Cooperative Disability Investigation Unit ("CDI") of the Social Security Administration, which had conducted an inquiry based on information provided in an anonymous letter. (A.R. at 262–63, 425–67.) The letter stated that Plaintiff had been working "under the table" from April through October of 2007. (A.R. at 427.) Since the CDI report is central to the parties' present dispute, it will be described in more detail below.

In any event, after receiving the CDI report, the ALJ scheduled another hearing, which was held on September 16, 2008. (A.R. at 26–77.) In a decision dated November 5, 2008, the ALJ reversed course and found that Plaintiff was not disabled. (A.R. at 13–77.) On February 6, 2009, the Decision Review Board ("DRB") affirmed the ALJ's decision (A.R. at 1–6), rendering it final for present purposes.

### III.  DISCUSSION

An individual is entitled to SSDI benefits if, among other things, he has an insured status and, prior to the expiration of that status, is under a disability. *See* 42 U.S.C. § 423(a)(1). In some contrast, an individual is entitled to SSI benefits if he is able to demonstrate both a disability and financial need. *See* 42 U.S.C. § 1381a.

Neither Plaintiff's insured status nor his financial need is at issue.

### A.  *Disability Standard and the ALJ's Decision*

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

■ In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of

severity, he is automatically not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth ... does the claimant's impairment prevent [her] from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability (question one); Plaintiff had impairments which were "severe" but which did not meet or medically equal one of the listed impairments in Appendix 1 (questions two and three); Plaintiff was prevented from performing his past relevant work (question four) but had the residual functional capacity to perform a significant number of light, unskilled jobs in the national economy (question five). As a result, the ALJ concluded that Plaintiff was not disabled.

### B. *Plaintiff's Challenge to this Decision*

In seeking to reverse the ALJ's decision, Plaintiff makes essentially two arguments: (1) that the decision was predicated on an error of law (the ALJ's "material abuse of discretion"); and (2) that the decision was not based on substantial evidence of record. Both arguments turn on the ALJ's consideration of the CDI report despite his having indicated at the conclusion of the May 19, 2008 hearing that he was "going to put [Plaintiff] on [benefits] for a year and a half." [3] This statement, Plaintiff argues, was binding on the Commissioner and was wrongfully reconsidered after the ALJ's receipt of the CDI report.

It is not clear, nor do the parties attempt to explain, just what the ALJ meant

---

3. The ALJ's statement at that first hearing was made in the following context:

> ALJ: ... I have enough, Counselor. I don't see anything, I don't see shoulder pain in the record.
> . . . .
> ATTY:—so—
> ALJ: Well, there's knee, there's knee—
> ATTY: Yeah.
> ALJ:—stuff in the records.
> ATTY: Yeah.
> ALJ: I don't see ankle pain in the record. But certainly he has serious knee problems and there is asthma, there's migraines, and major depression recurrent severe. So I don't think he can work right now. *I'm going to put you on for a year and a half.* I'll give you a year and a half to get your stuff together.
> CLMT: Okay, Your Honor.

> ALJ: Okay. You've got to focus on keeping your stuff together. You've done a good job in the year that you've been out. I have records on almost all of the time and it looked like sometimes you do well and sometimes you slip back a little bit but you keep going.
> CLMT: I, and I do and I want to—
> ALJ: Yeah.
> CLMT:—I want to get better, I mean—
> ALJ: Yeah.
> CLMT:—that's what's, and that's what I try to do all the time.
> ALJ: Okay. So I'm going to put you on but we're going to review you in about a year and a half.
> CLMT: Okay, Your Honor.
> ALJ: A year and a half you keep pounding at the problem.
> CLMT: Oh, I will, Your Honor.
> (A.R. at 126–27 (emphasis added).)

when he indicated that he would "put" Plaintiff on benefits a year for a year and a half. To be sure, the ALJ stated that "we're going to review you in about a year and a half" (A.R. at 127), but it remains unclear when the benefits were to commence and which benefits were at play. Given the court's ruling this day, however, the answers to these questions need not be pursued. In the end, the court believes that the ALJ's decision was not predicated on any legal error and was based on substantial evidence of record.

## A. *CDI Report*

The CDI report (A.R. at 427–67) states that Plaintiff was observed on May 1, 2008, driving a truck, removing a chair and a piece of exercise equipment from the truck, and carrying those objects into a building. Plaintiff was also seen making six more trips from the truck carrying additional items. In addition, Plaintiff was observed walking up a flight of stairs and skipping every other step.

The report also describes how on May 20, 2008, Plaintiff's neighbor told CDI investigators that Plaintiff helped his landlord with repairs and took care of the properties when the landlord was out of town. The neighbor also reported seeing Plaintiff do carpentry work in an apartment a few days before the interview. Two other neighbors told investigators that they believed Plaintiff worked for his landlord and saw him performing small jobs and generally caring for the property. The landlord, who was interviewed telephonically by the CDI investigator on June 3, 2008, initially denied that Plaintiff worked for him. He later admitted, however, that Plaintiff performed some painting and carpentry work for him.

The CDI investigator also interviewed Plaintiff's probation officer and the police chief of the town where Plaintiff had resided. The probation officer stated that Plaintiff had been competent and cordial, was in compliance with the terms of his probation, and had completed his community service obligation. He also stated that Plaintiff attended weekly meetings, as required, and understood instructions. For his part, the police chief told the investigator that Plaintiff regularly came to the police department to complete his community service. The chief also said that Plaintiff had assisted the water department when a water main broke and worked as a general laborer, including raking and picking up trash.

Plaintiff's counsel was made aware of the CDI report through correspondence from the ALJ. (A.R. at 262–63.) In response, Plaintiff's counsel asserted that nothing in the report convinced him that Plaintiff had performed any substantial gainful activity since the alleged onset date of his disability or had been less than truthful about the extent of his mental and physical limitations. (A.R. at 264.) Accordingly, Plaintiff's counsel urged the ALJ "to issue a favorable decision in this matter, as planned, without additional testimony." (*Id.*) In the alternative, counsel continued, "if the new evidence has caused you to reconsider the appropriateness of a favorable decision, [Plaintiff] hereby respectfully requests that a supplemental hearing be commenced." (*Id.*) Plaintiff's counsel's response was made part of the record. (A.R. at 264–66.) In fact, a notice for a "supplemental hearing" was sent Plaintiff on August 26, 2008, which also indicated that a vocational expert would testify. (A.R. at 78–85.)

## B. *Alleged Error of Law*

▮ In the main, Plaintiff argues that the ALJ ought not have considered the CDI report and, when doing so, committed

an error of law. In the court's view, Plaintiff's argument is unavailing.

For one thing, Plaintiff does not contest the fact that a CDI investigation may be appropriate in certain instances. Indeed, Plaintiff had no objection to the admission of the CDI report, among other exhibits, into evidence. (A.R. at 29.) Nor does Plaintiff challenge the credentials of the CDI investigator, *compare Orth v. Astrue,* 2008 WL 5110850, at \*\*2–3 (M.D.Fla. Nov. 28, 2008), although, at the reconvened hearing, he did question the propriety of the investigator's subsequent actions contacting the local district court where Plaintiff had previously been charged and convicted. (See A.R. at 37–38.)

Plaintiff argues, however, that rather than simply holding a 'supplementary hearing,' the ALJ wrongfully commenced a "de novo hearing" as if the first hearing on May 19, 2008, never transpired. More egregiously, Plaintiff argues, the ALJ at the reconvened hearing never asked Plaintiff any questions designed to ascertain the truth or falsehood of the statements elicited by the CDI investigation. Finally, Plaintiff argues, the ALJ's decision was improperly predicated on the CDI investigation having supposedly established "as fact" that Plaintiff "had a greater residual functional capacity than that previously alleged." (A.R. at 23.)

In the court's opinion and as the Commissioner asserts, Plaintiff's arguments give far too much weight to the ALJ's statement at the first hearing (of how he intended to rule) and far too little weight to the CDI investigation. If anything, the court finds, the evidence provides ample support for the ALJ's decision denying Plaintiff benefits.

First, the ALJ did not "vacate" a prior decision, as Plaintiff argues. As Plaintiff is well aware, the normal method of issuing a decision is in written format, *see* 20 C.F.R. § 405.371, and, here, Plaintiff was notified when the hearing was scheduled that a written decision would issue (A.R. at 81). More to the point, the ALJ's statement at the conclusion of the first hearing that he would find in Plaintiff's favor, even if clearly articulated, did not constitute an oral decision on the record. An oral decision can only issue "in certain categories of claims that [the Agency] identif[ies] in advance," 20 C.F.R. § 405.370(b), which did not occur here. Moreover, when an oral decision is issued, it must be accompanied with "specific reasons" followed within five days by a written decision incorporating the oral pronouncement. *Id.* That too did not occur.

Second, even if the brief statement at the conclusion of the hearing could be deemed an oral decision, the ALJ was free to make "substantive changes," *id.,* or consider new issues "before mailing notice of the hearing decision," 20 C.F.R. § 405.325(b), provided only that the claimant be given a chance to "address" the issue, *id.* Thus, however one treats the ALJ's statement, the CDI report, in the court's view, provided sufficient grounds for him to reconsider his position.

On this point, it is worth noting that there have been a number of recent cases in which a CDI investigation—generated by a variety of reasons, some understandable, some curious—played a part at an administrative hearing. *See Knox v. Astrue,* 660 F.Supp.2d 790, 800 (S.D.Tex. 2009) (malingering suspected by state agency psychologist); *Zargi v. Comm'r of Soc. Sec.,* 2009 WL 1505311, at \*3 (E.D.Cal. May 27, 2009) (similarity of diagnoses of claimants by a treating source not properly licensed as a psychologist); *Orth,* 2008 WL 5110850, at \*2 (Disability Determination Unit's suspicions of a claimant's exaggerated symptoms); *Jones v. Astrue,*

2008 WL 2571718, at **10–11 (S.D.Tex. June 26, 2008) (fraud investigation triggered after psychiatric review); *Lane v. Astrue*, 2008 WL 53706, at *2 (E.D.Tenn. Jan. 3, 2008) (investigation of possible work concealment). As might be expected, the weight given CDI reports by both administrative law judges and courts vary from case to case. Still, the caselaw provides some guidance with respect to such reports: the caution which should be exercised concerning secondary reliance on CDI reports by medical reviewers, *see, e.g., Knox*, 660 F.Supp.2d at 814 (remanding cases for further development); the adverse effect which a validated report can have on an individual's claim for benefits, *Zargi*, 2009 WL 1505311 at *11 (finding medical source unacceptable for purposes of determining whether an impairment exists); the effect which facts uncovered by the CDI unit and later confirmed can have on a claimant's credibility, *id.,* at **13–14 (claimant's past work); *Jones*, 2008 WL 2571718, at *15 (inconsistent behavior); and the fact that such reports may simply be too difficult to ignore, *Orth*, 2008 WL 5110850, at *2 (describing surveillance of claimant, wearing booties and entering a physician's office slowly in a "seemingly agonizing manner" "with an abnormal gait and with the assistance of a walker," but later observed shopping at a nearby store wearing sandals, "walking normally, and without a walker," "bending and squatting" and loading several packages into her van without difficulty). This is not to say, of course, that CDI reports are binding on either the administrative law judge or the court. However, to the extent a report provides factual rather than interpretive data, and to the extent the administrative law judge provides the claimant with an opportunity to address the report, *see, e.g.,*

*Orth*, 2008 WL 5110850, at *3 n. 4, the report may be given appropriate weight based on all the circumstances.

Here, as described, Plaintiff was provided the opportunity to respond to the CDI report. He did so not only in correspondence to the ALJ prior to the hearing but, as well, in a lengthy and detailed exposition by his counsel at the beginning of the supplemental hearing. (A.R. at 31–36.) In essence, Plaintiff conceded that he had been moving furniture when he was observed by the CDI investigator (for a twenty-seven minute period) but maintained that this was a one-day event related to his changing residences. Plaintiff also asserted that the anonymous tip about his working under the table had been made by a former girlfriend who wanted to get him into trouble and that those same allegations had not been substantiated by the state welfare agency. (A.R. at 35.) Plaintiff also cited his landlord's September 15, 2008 letter to the ALJ stating that he and Plaintiff never had an employer/employee relationship, advising that Plaintiff had only performed some minor carpentry and painting work and had simply moved some furniture for him on May 1, 2008, and, finally, asserting that one of the individuals interviewed by the CDI unit was not reliable. (A.R. at 267–68.) In addition, Plaintiff himself testified about these matters at the supplementary hearing (A.R. at 67–68.) [4]

Given all this, Plaintiff's argument that the ALJ did not ask particular questions of Plaintiff regarding the CDI report is of little moment. In the end, it was within the ALJ's discretion to evaluate the report, along with the other evidence of record, and assign it what weight he deemed due. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st

4. Following the ALJ's unfavorable decision, Plaintiff also provided the DRB with a statement addressing the CDI report. (A.R. at 7–12.)

Cir.1991). Plaintiff's present arguments notwithstanding, the court finds the ALJ's treatment of the CDI report in his decision, albeit brief, both adequate and, given the entirety of the record, reasonable.

## C. Substantial Evidence Allegation

■ The court finds as well that the ALJ had substantial evidence with which to conclude that Plaintiff could perform a limited range of light work. This is not to say that Plaintiff did not suffer from some impairments, as the ALJ found. Moreover, it is clear from the record that Plaintiff felt socially isolated, had few community supports, was dealing with serious issues concerning his children and, as the ALJ indicated, "presented sincerely." (A.R. at 22.) Nonetheless, Plaintiff conceded that he could perform activities, such as moving furniture and minor home maintenance, on a limited basis at his own pace. And, apart from the CDI report, the record also contains Plaintiff's acknowledgment of performing other work activities including community service. (See A.R. at 388 (doing some work for landlord), 386 (similar), 393 (helping landlord) and 403 (uncompensated work for landlord).) As the Commissioner argues, the ability to do such work, even on a limited basis, can support the conclusion that an individual can do more than he may have asserted. See 20 C.F.R. §§ 404.1571, 416.971; Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir.1991); Berger v. Astrue, 516 F.3d 539, 546 (7th Cir.2008); Rogers v. Barnhart, 204 F.Supp.2d 885, 894 (W.D.N.C.2002).

The ALJ also had substantial evidence to conclude that the medical record did not document a disabling physical condition. There are only two notations regarding knee pain after Plaintiff's release from jail in 2007, and nothing at a level that would indicate a disabling condition. (See A.R. at 348, 420.) Moreover, there was no medical opinion which contradicted the state agency's determination that Plaintiff could perform light, if not medium, work. See 20 C.R.F. §§ 404.1567(c), 416.967(c). See also Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13 (1st Cir.1982) (assessments of a non-examining physician may constitute substantial evidence in support of his administrative law judge's decision). As the Commissioner argues, the difference between the state agency's finding that Plaintiff could only occasionally climb and the ALJ's finding that Plaintiff could frequently climb is of little consequence. See Social Security Ruling ("SSR") 83–14; SSR 85–15; POMS DI 25020.005.A.1.a ("As a general rule, a small degree of limitation (e.g., the person retains the capacity to ascend and descend ramps and stairs but cannot maintain balance on a ladder) would not significantly impact on any range(s) of work). And with regard to Plaintiff's mental capacity, there is substantial evidence of record supporting the ALJ's determination that Plaintiff could perform simple, routine tasks. See Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 4–5 (1st Cir. 1991) (evidence that the plaintiff could cook, clean, shop, garden, read, and visit with relatives supported the ALJ's finding that she could perform unskilled or semi-skilled work); Giancola v. Shalala, 913 F.Supp. 638, 645 (D.Mass.1996) (ability to watch television was inconsistent with alleged concentration difficulties).

Notes from Plaintiff's counselors (see A.R. at 44, 93, 343, 347, 364, 379, 381, 403, 407, 409) also paint a picture of an individual who was coping and adapting, interacting socially, keeping busy, taking medication and receiving therapy to help him adjust. See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir.1983) (symptoms which can be reasonably controlled by medication

or treatment are not disabling). The state agency psychologist also concluded that Plaintiff could understand, remember and complete simple, routine tasks, relate in a socially appropriate manner, and adapt to a work setting. (A.R. at 340–41.) If anything, Plaintiff's statement that he felt he could not work because of his conviction, as well as his expressed desire to return to work as a firefighter once his name was cleared (A.R. at 366, 383), undercuts his claim.

■ Further, as the Commissioner argues, Plaintiff's GAF scores were not inconsistent with an ability to work. Although a score of 50 indicates serious symptoms that could suggest an inability to hold a job, it does not necessarily mean that a person is unable to meet the basic mental demands of competitive remunerative unskilled work. *See Querido v. Barnhart,* 344 F.Supp.2d 236, 246 (D.Mass.2004) (unaddressed GAF ratings of 45 and 50 did not appreciably detract from findings of residual functional capacity containing moderate mental limitations). *See also Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002) ("ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate").

■ Finally, contrary to Plaintiff's argument, the ALJ did not need to separately assess Plaintiff's panic and obsessive-compulsive disorders. Although, certain treatment notes mention these traits, the conditions were not part of his diagnoses. (A.R. at 349, 351, 353, 355, 357, 359, 361, 363, 365, 367, 370, 374, 376, 378, 380, 382, 385, 387, 389, 391, 393, 396, 400, 402, 404, 406, 408, 410.) Rather, as the Commissioner asserts, the symptoms were captured in the diagnoses of depression and PTSD, impairments the ALJ found severe. (A.R. at 19.) In all, the ALJ's evaluation of the medical evidence reflects full consideration of the combined effects of Plaintiff's impairments.

■ When faced with conflicting evidence, it is the responsibility of an administrative law judge to make the final determination of credibility and weight. *Lizotte v. Sec'y of Health & Human Servs.,* 654 F.2d 127, 128 (1st Cir.1981); *Rodriguez,* 647 F.2d at 222. The administrative law judge's decision must be affirmed "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir.1987). *Accord Ortiz,* 955 F.2d at 769. That, in the court's opinion, is the situation here. In short, Plaintiff has failed to convince the court that the ALJ or, in turn, the DRB lacked substantial evidence with which to conclude that, given his age, education and work experience, Plaintiff retained the residual functional capacity to engage in unskilled work at the light level of exertion.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion to reverse or remand is denied and the Commissioner's motion to affirm is allowed.

IT IS SO ORDERED.