Corrine BELIVEAU, on Behalf
of Raymond BELIVEAU,
Jr., Plaintiff,

v.

Kenneth S. APFEL, Commissioner,
Social Security Administration,
Defendant.

No. Civ.A. 99–40180–NMG.

United States District Court,
D. Massachusetts.

March 27, 2001.

David R. Patterson, Shrewsbury, MA,
for Plaintiff.

Mary Elizabeth Carmody, United States
Attorney's Office, Worcester, MA, for
Plaintiff.

## MEMORANDUM & ORDER

GORTON, District Judge.

Pending before this court are the defendant's motion for an order affirming the decision of the Commissioner (Docket No. 11) and the plaintiff's Motion to Reverse or Remand the Decision of the Commissioner (Docket No. 13).

### I. Procedural History

On February 27, 1996, Corrine Beliveau ("Mrs.Beliveau") filed an application for Supplemental Security Income ("SSI") disability benefits on behalf of her son, Raymond Beliveau ("Raymond"), alleging that he had been disabled since birth due to a kidney condition, renal hypertension and an affective disorder. The application was denied initially and upon reconsideration. Mrs. Beliveau requested a hearing before an Administrative Law Judge ("ALJ"). Raymond, represented by counsel, and Mrs. Beliveau appeared and testified at that hearing, which was conducted on March 30, 1998 before ALJ Francis C. Newton. On June 26, 1998, the ALJ issued a decision finding that Raymond was not disabled under the Social Security Act.

In August, 1998, Mrs. Beliveau requested review of the ALJ's decision by the Appeals Council. The Appeals Council afforded the plaintiff 45 days from March 24, 1999, within which to provide it with any additional information. Such information was provided to the Appeals Council, including letters from schools and doctors regarding Raymond's condition. On May 28, 1999, two days after the expiration of the 45-day deadline, counsel for Raymond faxed a copy of an undated letter from the Worcester Youth Guidance Center ("WYGC") to the Appeals Council.

On June 30, 1999, the Appeals Council denied the plaintiff's request for review and indicated that the decision of the ALJ stood as the final decision of the Commissioner of Social Security in the case. The Order of the Appeals Council indicates that when it made the decision to deny the plaintiff's request for review, it considered all of the additional information submitted except the letter from the WYGC, which presumably was ignored because it was received after the imposed deadline.

On July 6, 1998, before the review described in the preceding paragraph, Mrs. Beliveau re-applied for SSI benefits on behalf of Raymond. On June 2, 1999, that application was approved and Raymond was found eligible for SSI benefits from July, 1998 through July, 1999.

### II. Factual History

Raymond was born on August 3, 1983. He was 12 years old at the time the original application for SSI benefits was filed and 14 years old at the time the ALJ denied that application.

### A. Physical Issues

Raymond was born with a congenital left kidney obstruction that was not diagnosed until the age of five when he suffered a renal contusion after being struck by an automobile. While hospitalized in 1989, Raymond underwent a pyeloplasty which required stent placement and a nephrotomy. A repeat pyeloplasty was performed in December, 1990. A repeat radionuclide scan performed in July, 1993 revealed normal function on the right and poor, fallen function on the left without evidence of high grade obstruction and relative activity of 15%. Another renal radionuclide scan performed in 1995 showed similar results with approximately 10 to 15% function on the left. In May, 1996, Raymond's treating physician determined that surgical intervention was inadvisable given the residual function in the left kidney.

In November, 1995, Raymond began treatment for problems associated with high blood pressure. He was placed on Lisinopril and is expected to take some form of antihypertensive medication for the rest of his life. According to a February, 1998 letter from Dr. William Primack, Raymond's treating physician, Raymond does not consistently take his medication.

## B. Academic Issues

In the fifth grade, Raymond began experiencing academic performance problems and his grades declined significantly. Because of those problems Mrs. Beliveau enrolled Raymond in the Bancroft School for the sixth grade during the 1996–1997 academic year. Although of average intelligence, he routinely didn't do his homework or prepare for exams and failed four academic courses that year. His teachers described him as inconsistent and lacking focus.

"The following academic year" (according to the briefs), Raymond attended the Hillside School, a school with a structured program designed for students with low self-esteem and academic underachievement.[1] Raymond's grades showed some improvement although a wide disparity existed. In math and science he earned A's and B's while in history and English he earned low C's and D's.

Although Raymond's academic performance had improved while at the Hillside School, he wanted to return to public school, and in the eighth grade he attended Mount View Middle School. He completed the first term with only one F grade but by the third term he failed nearly all of his academic courses, with the exception of science (D-) and math (C+).

## C. Behavioral Issues

Raymond experiences behavioral problems as well. At the hearing before the ALJ, Mrs. Beliveau testified that Raymond witnessed his father's violent behavior toward her and that after she and her husband separated and his father "abandoned" him for a period of several months, Raymond became suicidal. She said that for a period of three months in late 1996, Raymond "just laid on his bed ... and wouldn't do anything."

In the summer of 1996, Mrs. Beliveau sought treatment for Raymond at the Worcester Children's Friend Society. The "Mental Status Evaluation" conducted in August, 1996 describes Raymond as "angry" and "sad" with "poor" judgment and insight, although his "mental trend/content of thought" was described as "normal". The counselor noted that he appeared to be having difficulty coping with his parents' separation and pending divorce and that his grades had declined significantly. The counselor also reported repeated instances of angry moods and/or angry behavior. He was diagnosed as having adjustment disorder with mood disturbance. The Society discharged Raymond on March 4, 1997, after 12 one-hour sessions, because of a series of missed appointments which Raymond attributed to his counselor's breach of confidentiality.

In October, 1996, Dr. Milton Taylor saw Raymond for a psychodiagnostic interview. Although Dr. Taylor's report indicates that Raymond complained of mild fatigue secondary to his kidney problem, Dr. Taylor noted that Raymond had no major physical restrictions. Mrs. Beliveau indicated that she had not seen any compelling signs or symptoms of Attention Deficit Disorder

1. There is an unexplained discrepancy in dates here because Raymond is said to have attended the Hillside School in the 1996–1997 academic year, the same year he supposedly attended the Bancroft school.

and Dr. Taylor noted that perhaps Raymond appeared mildly dysthymic but there was no evidence of major depression. Dr. Taylor noted that Raymond was cooperative during the administration of various behavior tests and the results of those tests estimated Raymond's general level of intellectual functioning at the bright normal to superior range. Dr. Taylor offered diagnoses of an adjustment disorder with depressed mood and mild conduct disturbance and ruled out dysthymic disorder (masked), childhood onset.

Later psychological and psychoeducational analyses of Raymond performed by various physicians noted that Raymond's poor grades were likely a function of an emotional disorder and not a significant learning disability. Those reports indicate that Raymond had no prominent indicators of excessive restlessness, distractability or attention span difficulties. In November, 1996, Raymond demonstrated a full scale I.Q. of 101 which placed him in the Average range of intellectual activity.

Mrs. Beliveau maintains that Raymond has social withdrawal problems at school and has never had any friends, either at or outside of school. Dr. Taylor's October, 1996 report states that Raymond had participated in the Boy Scouts for the prior seven years and had earned two Merit Badges. Reports filed by Raymond's doctors with respect to his kidney problems indicate that he has had continual difficulty in complying with instructions to take his medication, although when taken the medication provided fairly good control of his hypertension. Those reports also indicate that Raymond experienced sleep disturbances.

On April 15, 1997, Joseph Litchman, Ph. D., a staff psychologist with Disability Determination Services, a state agency that works with the Social Security Administration, found that Raymond's depression was severe but did not rise to the level of a "disability" as defined under the Social Security Act. Dr. Litchman concluded that Raymond had no limitation in functioning except for a "less than marked" limitation in the areas of "social development" and "concentration, persistence, or pace".

According to Mrs. Beliveau, Raymond requires repeated prompting to do the basic activities involved in getting up in the morning and going to school. He also gets frustrated and angry very easily and has "2-year old tantrums" exhibited by screaming, swearing, punching walls and throwing and breaking things. On occasion, he experiences dizziness, fatigue, headaches and vision problems.

On October 22, 1998, Raymond assaulted his sister by pushing her into a bookcase, causing her to fall and injure her right shoulder blade. Mrs. Beliveau called the police and as a result of the incident, Raymond was ordered to enter counseling at the Worcester Youth Guidance Center ("WYGC"). He began such counseling on November 16, 1998. In an undated letter from the WYGC, Raymond was found to meet the criteria for dysthymia. That letter notes that Raymond has poor medical compliance with his liver and hypertension medication, that he has little respect for the authority of his mother and that he stated he would be uncooperative during any psychological testing and medical evaluations.

### III. Discussion

Ms. Beliveau contends that the final decision is not supported by substantial evidence and therefore seeks a reversal of the ALJ's decision. In the alternative, Ms. Beliveau seeks a remand so that she might submit additional evidence probative of the issue regarding disability.

## A. Whether the Commissioner's decision is supported by substantial evidence

### 1. Standard of Review

Federal courts may review only the "final" decision of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g). An ALJ's decision is the "final" decision of the Commissioner unless the Appeals Council decides to grant review. 20 C.F.R. § 416.1481. If the Appeals Council grants review, then its later decision becomes the "final" decision of the Commissioner for purposes of judicial review. *Id.* In this case, the decision of the ALJ is the "final" decision because the Appeals Council declined to grant review.

█ Judicial Review in Social Security disability cases is limited to determining whether the final findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Lizotte v. Secretary of Health and Human Services,* 654 F.2d 127, 128 (1st Cir.1981). Thus, this Court must affirm the ALJ's final decision "even if the record could justify a different conclusion, so long as it is supported by substantial evidence." *Evangelista v. Secretary of Health and Human Services,* 826 F.2d 136, 144 (1st Cir.1987), *quoting Pagan v. Secretary of Health and Human Services,* 819 F.2d 1, 3 (1st Cir.1987).

### 2. Disability Determination

In order to qualify for SSI disability benefits under § 1602 of the Social Security Act, 42 U.S.C. § 1381(a), an individual must file an application for SSI benefits based on disability and must be an eligible individual with respect to income and resources as defined in § 1611(a) of the Act, 42 U.S.C. § 1382(a).

Under the provisions of the Social Security Act, a child under the age of 18 is considered "disabled" for purposes of eligibility for SSI benefits if he has a medically determinable physical or mental impairment which results in marked and severe functional limitation, and which has persisted or can be expected to persist for a continuous period of at least 12 months or result in death.

In determining whether a child is eligible for SSI benefits on the basis of disability, a three-step evaluation process is followed. 20 C.F.R. § 416.924. First, it must be determined whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, the second step requires a determination of whether the child's impairment or combination of impairments is "severe". A child's impairment that is so "slight" as to cause no more than minimal functional limitations is not "severe" and such a child is not disabled under the Act. 20 C.F.R. § 416.924(c).

Finally, the third step requires a determination of whether the impairment meets or medically equals in severity the criteria for an impairment listed in the "Listing of Impairments" in Appendix 1 of Subpart P of the Commissioner's disability regulations, 20 C.F.R., Part 404, or whether the impairment is functionally equal in severity to a listed impairment. If the child does not have an impairment which medically meets or equals the listed impairments, or is functionally equivalent in severity to a listed impairment, he will be found to be "not disabled". 20 C.F.R. § 416.924(d). "Functional equivalence" may be measured in any of four ways detailed at 20 C.F.R. § 416.926a(b)(1)-(4).

With respect to all disability claims for SSI benefits, the plaintiff must demonstrate that he was disabled within the meaning of the Act on or after the date on which he applied for benefits and before the date of the ALJ's decision. 20 C.F.R. § 416.305. Mrs. Beliveau applied for bene-

fits on behalf of Raymond on February 27, 1996, with a protective filing date of January 17, 1996, and the ALJ rendered his decision on June 26, 1998.

In his decision, the ALJ found the following:

(1) that Raymond had not engaged in substantial gainful activity during any part of the period under adjudication;

(2) that Raymond's adjustment disorder kidney problem and renally induced hypertension are "severe" within the meaning of 20 C.F.R. § 416.924(c);

(3) that those impairments were not of a severity which medically meets or equals the severity of any impairment listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404 ("Listing of Impairments");

(4) that he had considered listed impairments related to mental impairments at listings 112.02 through 112.12; and

(5) that Raymond does not suffer from an impairment or impairments that is *functionally* equal in severity to a listed impairment, nor does he have "marked" or "extreme" limitations in any areas of functioning.

■ The ALJ's decision is supported by substantial evidence in the record which shows that Raymond's adjustment disorder, kidney problem and renally induced hypertension are not disabling within the meaning of the Social Security Act. The ALJ appropriately evaluated the record evidence in light of all the impairments listed in Appendix 1, including listed impairments related to mental impairments at 112.02 through 112.12.

The ALJ also considered whether Raymond's impairments were functionally equivalent to a listed impairment by considering whether they resulted in (1) an extreme limitation in one or more specific functions described as criteria for disability in listed impairments or (2) limitations in several broad areas of functioning that are "extreme" in at least one area of functioning or "marked" in at least two areas. The ALJ found that Raymond had no limitation in cognitive/communication functioning, that he had a moderate but less than marked limitation in social functioning, and that he had a moderate but less than marked limitation in concentration, persistence, and pace.

Because substantial evidence exists in the record to support the conclusion that Raymond's physical and behavioral problems are not equal to the level of severity of the Listings of Impairments, nor functionally equal in severity to those listed impairments, the ALJ's decision will be affirmed by this Court.

## B. Whether the new evidence presented by the plaintiff is sufficient to warrant a remand

■ The plaintiff also maintains that the case should be remanded on the basis of new and material evidence he has now submitted. This evidence consists of (1) an undated report from the Worcester Youth Guidance Center ("WYGC") and (2) an award letter showing that a subsequent SSI claim was allowed.

■ A Court may consider additional evidence when (1) the evidence is new and material and (2) there is good cause for failing to incorporate it during the prior proceeding. 42 U.S.C. § 402(g). To be material, the evidence must be "both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Tirado v. Bowen*, 842 F.2d 595, 597 (2d. Cir.1988). The concept of materiality requires a reasonable possibility that the new evidence would have

influenced the Secretary to decide claimant's application differently. *Id.* Furthermore,

> [a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previous non-disabling condition.

*Szubak v. Secretary of Health and Human Services,* 745 F.2d 831, 833 (3rd Cir.1984).

The decision of the ALJ denied benefits from January 17, 1996 through June 26, 1998 (the date of the decision). The two pieces of subject evidence do not appear to be relevant to that time period. The WYGC letter was written sometime after Raymond began at the WYGC on November 16, 1998, at most five months after the ALJ's decision. The subsequent allowed SSI claim awarded Raymond benefits for the period from July, 1998 through July, 1999 and is similarly irrelevant to the time period between January, 1996 and June, 1998. *See* 42 U.S.C. § 405(g). Additionally, even if the Commissioner had considered the new evidence, such consideration would not have resulted in a different decision regarding Raymond's status as disabled under the Social Security Act.

### ORDER

For the foregoing reasons, the plaintiff's Motion to Reverse or Remand the Decision of the Commissioner (Docket No. 13) is **DENIED** and the defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 11) is **ALLOWED.**

**So ordered.**