**Carmen PAGAN, on behalf of her son, A.C., Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of the Social Security Administration, Defendant.**

**Civil Action No. 09–30162–KPN.**

United States District Court, D. Massachusetts.

June 23, 2010.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

Tricia M. Jacobs, Law Offices of Thomas Libbos, Springfield, MA, for Plaintiff.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 9 and 11)*

NEIMAN, United States Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding a child's entitlement to Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3) (referencing 42 U.S.C. § 405(g)). Carmen Pagan ("Plaintiff") asserts that the Commissioner's decision denying her son "A.C." such disability benefits—memorialized in an April 23, 2009 decision of an administrative law judge—is in error. She has filed a motion for judgment on the pleadings seeking to reverse the decision and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been assigned to the undersigned for all purposes, including entry of judgment. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73(b). For the reasons that follow, the Commissioner's motion to affirm will be granted and Plaintiff's motion will be denied.

I. *STANDARD OF REVIEW*

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to sup-

port a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter … a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. *Background*

### A. *Medical History*

A.C. was two years old in February of 2008 when Plaintiff applied for benefits on his behalf. (Administrative Record ("A.R.") at 107–13.) By the time the administrative law judge issued his decision in April of 2009, A.C. was three years old and attending pre-school. (A.R. at 25, 37.)

A.C.'s medical history is not really in dispute. As is relevant here, he was first seen at Holyoke Health Center on May 2, 2006, for renewal of his asthma medi-cations, which consisted of both Albuterol and Pulmicort for an updraft machine. (A.R. at 188–90.) Dr. Yeshvant Talati noted A.C.'s four to eight month history of asthma, as well as a family history of asthma. (A.R. at 188.) Dr. Talati also indicated that both A.C.'s "mom and grandmother happen to be smokers and they were encouraged not to smoke in the house, or better still, to even give up cigarette smoking." (*Id.*)

From August through December of 2006, A.C. was seen several times at the Holyoke Health Center for asthma exacerbation and an ear infection. (A.R. at 270–76.) Various progress notes for these visits indicate that A.C. was generally doing well, using Pulmicort daily and Albuterol if wheezing occurred. (See *id.*) Other notes reflect that A.C. was eating and sleeping well (A.R. at 185), was alert and playful (A.R. at 183), and normally did not need the Albuterol (A.R. at 180).

A.C. was also treated at the Holyoke Health Center from February of 2007 through February of 2008 for flu symptoms, asthma exacerbation, and anemia. (A.R. at 161–176, 288–89.) During this time, A.C. received refills for his asthma medications along with a prescription for Singulair and iron supplements. (See *id.*) He was also observed as being an "interactive, talkative" child with only "mild, persistent" asthma. (A.R. at 161.)

Around the same time, in January, August and October of 2007, A.C. was seen at the Holyoke Hospital Emergency Department for strep throat, bronchitis, upper respiratory infection, asthma exacerbation, and anemia. (A.R. at 221–24, 426–39.) Although an August 2007 chest x-ray showed that A.C.'s lungs were fairly well expanded and clear, an accompanying doctor's note indicated that A.C. was exposed to second-hand smoke. (A.R. at 433–39.) After each visit, A.C. was discharged and advised to

use Albuterol, Pulmicort and an iron supplement. (*See* A.R. at 221–24, 426–39.)

On February 18, 2008, the Holyoke Hospital Emergency Department found A.C. in some respiratory distress; he was treated for otitis media, acute bronchitis, upper respiratory infection and asthma. (A.R. at 218–20, 309–12.) He was released with medications of Albuterol, Pulmicort, Prednisone and Proventil, but returned to the Emergency Department on April 26, 2008, for treatment of the same medical conditions. (See *id.*) Thereafter, medical records from Holyoke Health Center from April through November of 2008 show continued treatment for asthma, flu symptoms, and routine well-child visits. (A.R. at 318–25, 377–88.)

Meanwhile, in March of 2008, Dr. Ramesh Mundra, a physician who reviewed A.C.'s records for the Social Security Administration ("SSA"), concluded that A.C.'s asthma was severe, but that it did not meet or equal an automatically-disabling "listed" impairment (see discussion, *infra* ). (A.R. at 241.) Dr. Mundra also found that A.C. had some limitations in the area of health and general well-being but no significant limitations in any other area. (A.R. at 241–46.) Soon thereafter, Dr. Robert Downes, a pediatrician who also reviewed A.C.'s records for the SSA, noted "less than marked" limitations in health and general well-being but no other limitations. (A.R. at 250–55.) Then, in June of 2008, Dr. Nancy Kwon, another medical consultant, essentially concurred with the other assessments (A.R. at 256–58) and, in July of 2008, a Dr. "Dialto" indicated that A.C. had only "moderate persistent asthma" controlled by medication. (A.R. at 372.)

A December 18, 2008 consultative examination report by yet another physician, Dr. Robert Gerstle, noted that A.C. had moderate persistent asthma with continued daily symptoms and intermittent acute exacerbations precipitated at times by viral infections. (A.R. at 298–301.) Dr. Gerstle also noted that, while there were some emergency room visits, A.C.'s condition had not required hospitalization. (See *id.*) Later that same day, A.C. was again seen at the Holyoke Hospital Emergency Department; however, he was found to be in no apparent distress. (A.R. at 341–45.)

A.C. returned to the emergency room on January 13, 2009, for asthma exacerbation and an upper respiratory viral infection, but a chest x-ray showed no active lung disease or evidence of pleural effusion. (A.R. at 351–57.) Medical reports in January and March of 2009 reflect treatment for an upper respiratory infection and prescription refills. (A.R. at 402–04.)

B.  *Procedural History*

Plaintiff applied for SSI benefits on behalf of A.C. on February 8, 2008. (A.R. at 107–13.) After the application was denied both initially and by a Federal Reviewing Official (A.R. at 60–65), Plaintiff requested a hearing before an administrative law judge ("ALJ"), which hearing, after a delay to enable Plaintiff to retain counsel, was held on April 6, 2009 (A.R. at 26–41).

Plaintiff testified at the hearing. Among other things, Plaintiff testified that A.C. suffered from frequent colds, infections and appetite disturbances and was, in general, not healthy. (A.R. at 35, 37–38.) She also testified that A.C.'s asthma medications made him hyperactive and aggressive. (A.R. at 35.) In addition, the ALJ questioned Plaintiff about her smoking habits and her own claim for disability benefits. (A.R. at 33–34, 36.)

In a decision dated April 23, 2009, the ALJ found that A.C. was not disabled. (A.R. at 8–25.) When the Commissioner's Decision Review Board did not complete a requested review within the ninety days allowed, the ALJ's decision became final

for present purposes. (See A.R. at 1–3.) Thereafter, on September 28, 2009, Plaintiff filed this lawsuit and, in due course, the parties filed the memorandum of law now at issue.

### III. DISCUSSION

Unlike most *adult* SSI disability cases handled by this court, the instant action involves *childhood* benefits that are determined under somewhat different standards. *Compare, e.g., Robert v. Astrue,* 688 F.Supp.2d 29 (D.Mass.2010); *Baez v. Astrue,* 593 F.Supp.2d 310 (D.Mass.2009); *Perkins v. Astrue,* 568 F.Supp.2d 102 (D.Mass.2008). Accordingly, the court will first describe the childhood disability standard for SSI benefits—and the ALJ's decision with respect thereto—and then turn to Plaintiff's specific challenges to the ALJ's decision.

### A. CHILDHOOD DISABILITY STANDARD AND THE ALJ's DECISION

■ The parties agree that, in order for a child to be found disabled and entitled to SSI benefits, he must meet the standards of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193 (the "PRWORA"), enacted on August 22, 1996. As codified, the PRWORA provides as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).

■ The parties also agree that the Commissioner has established a three-step protocol for determining whether a child under age eighteen is disabled. *See Beliveau v. Apfel,* 154 F.Supp.2d 89, 93 (D.Mass.2001) (citing 20 C.F.R. § 416.924). First, the Commissioner must determine whether the child is engaging in "substantial gainful activity." *Id.* (citing 20 C.F.R. § 416.924(b)). If not, the Commissioner must next determine whether the child has an impairment (or a combination of impairments) that is "severe." *See id.* (citing 20 C.F.R. § 416.924(c)). Third, the Commissioner must determine whether the impairment meets, medically equals, or functionally equals an impairment listed in the "Listing of Impairments" from Appendix 1 of Subpart P of the Commissioner's regulations. *See id.* If the child's impairment does not meet, medically equal, or functionally equal a "listed" impairment, the child will be deemed "not disabled." *Id.* (citing 20 C.F.R. § 416.924(d)).

■ Finally, the parties agree that "functional equivalency" may be measured in a number of ways, but specifically in "domains" such as (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *See id.;* 20 C.F.R. § 416.926a(b)(1). To qualify as functionally equivalent to a listing, the child's impairment "must result in [either] 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The child has a "marked" limitation—*i.e.,* one "that is 'more than moderate' but 'less than extreme' "—when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). The child has an "extreme" limitation—*i.e.,* "the rating [the Commissioner] gives to the worst limitations"—when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete

activities." 20 C.F.R. § 416.926a(e)(3)(i). These limitations are described more fully below.

In the instant case, the ALJ found that A.C., as an older infant, had not engaged in any "substantial gainful activity" (step one) and also had a "severe" impairment of asthma (step two) which did not meet or medically equal (the beginning of step three) a listed impairment. (A.R. at 17–19.) In doing so, the ALJ also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of A.C.'s symptoms were not credible as they were inconsistent with the medical evidence. (A.R. at 19.) Finally, with regard to "functional equivalency" (the remainder of step three), the ALJ found that A.C. had "no limitations" in (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, or (4) caring for himself, and "less than marked" limitations in (5) moving about and manipulating objects and (6) health and physical well-being. (A.R. at 20–25.) Absent "marked" limitations in two domains or "extreme" limitations in one domain, the ALJ concluded that A.C. was not disabled. (A.R. at 25.)

B. PLAINTIFF'S CHALLENGE TO THE ALJ'S DECISION

In challenging the ALJ's decision, Plaintiff makes essentially two arguments. First, she asserts that the ALJ's conclusion of "less than marked" limitations in the domain of "health and physical well-being" was not supported by substantial evidence. Second, Plaintiff contends that the ALJ's conclusion as to her own credibility should not have been a factor in determining A.C.'s eligibility for SSI. For the reasons which follow, Plaintiff's arguments are not persuasive.

1. *Health and Physical Well–Being*

■ With regard to Plaintiff's first argument, the court begins with two pre-liminary matters. First, it must be understood that Plaintiff conceded at the administrative hearing that A.C.'s condition did not meet or medically equal Listing 103.03, which relates to childhood asthma:

ALJ: [Counsel], do you contend this case meets a listing or do you think that I need to do a functional analysis?

ATTY: I believe you have to do a functional analysis.

ALJ: Well, ma'am, I am going to. So you don't believe it meets a listing then, correct?

ATTY: I don't believe so.

(A.R. at 39.) As the Commissioner asserts, therefore, the only question with regard to Plaintiff's first argument is whether the record contains adequate support for the ALJ's conclusion that the impairment was not "functionally equal" to a listed impairment. 20 C.F.R. § 416.924(d).

Second, given other representations at the administrative hearing, it bears repeating that, to prove "functional equivalency," Plaintiff had to prove that A.C. had either a "marked" limitation in two domains or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926(b). As it turns out, Plaintiff focused on A.C.'s limitations in only one domain, health and well-being, arguing that he suffers from an extreme limitation in that regard:

ALJ: [Counsel], what domains do you believe that this child has marked or extreme limitations in?

ATTY: I believe extreme in health and well-being with the asthma.

ALJ: Any others?

ATTY: No, I believe it's just an extreme limitation.

ALJ: So you believe his health and well-being is an extreme limitation and in all the other domains he has none?

ATTY: Or less than marked, I would believe. Because there's no documented evidence of any other limitations other than the asthma.

(A.R. at 39–40.) Thus, to succeed before this court, Plaintiff must show that there was insubstantial evidence for the ALJ to have concluded, as he did, that A.C. had no extreme limitation in the domain of health and well-being.

The regulatory standards regarding an extreme limitation are somewhat lengthy. The regulation begins by generally defining the limitation as follows:

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack of loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i). The regulation goes on as follows with regard to children in A.C.'s age bracket at the time:

(ii) If you have not attained age 3, we will generally find that you have an "extreme" limitation if you are functioning at a level that is one-half of your chronological age or less when there are no standard scores from standardized tests in your case record.

20 C.F.R. § 416.926a(e)(3)(ii). As to children of any age, the regulation continues as follows:

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score. (See paragraph (e)(4) of this section.)

20 C.F.R. § 416.926a(e)(3)(iii). Finally, with regard to the domain of "health and physical well-being," the regulation concludes as follows:

(iv) For the sixth domain of functioning, "Health and physical well-being," we may also consider you to have an "extreme" limitation if you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation in paragraph (e)(2)(iv) of this section. However, if you have episodes of illness or exacerbations of your impairment(s) that we would rate as "extreme" under this definition, your impairment(s) should meet or medically equal the requirements of a listing in most cases. See §§ 416, 925 and 416.926.

20 C.F.R. § 416.926a(e)(3)(iv).

Unfortunately for Plaintiff's quest, the ALJ had substantial evidence with which to conclude that A.C.'s limitations were not functionally equivalent to an extreme limitation in the area of health and physical well-being. For one thing, A.C.'s treating physicians, at most, document only a moderate limitation in that domain. For example, in July of 2008, as indicated, Dr.

Dialto indicated that A.C. had only "moderate persistent asthma" controlled by medication. Moreover, various check-up notes around that time reflect that A.C. was eating and sleeping well, was alert and playful, normally did not need the Albuterol, and was an interactive, talkative child with only mild, persistent asthma.

Second, Dr. Gerstle, the consultative physician who saw A.C. in December of 2008, concluded that A.C.'s persistent asthma was moderate in nature, albeit with intermittent exacerbations. In fact, Dr. Gerstle noted that Plaintiff herself described her son as "very much like other 3–year–old boys" except maybe having a higher energy level, perhaps due to the medication. Dr. Gerstle also found A.C. to be well-nourished, without being overweight, and cooperative during the examination. Although Dr. Gerstle observed some wheezing on examination, the Albuterol resulted in a "complete clearing of [A.C.'s] chest and normalization of his respiratory rate."

To be sure, A.C. experienced intermittent exacerbations of his asthma, but the acute episodes were not sufficiently prolonged to meet the standard for an extreme impairment. According to the Commissioner's regulations, an extreme impairment requires prolonged exacerbations in excess of that required to establish a marked impairment, 20 C.F.R. § 416.926(e)(3)(iv), *i.e.*, at least three episodes a year, each one lasting for at least two weeks, 20 C.F.R. § 416.926(e)(2)(iv). Here, A.C. was seen in the emergency room on four occasions between February of 2008 and January of 2009. In February of 2008, he had a three-day exacerbation of asthma in connection with bronchitis and otitis, along with fever and body aches. In April of 2008, he was seen again at the emergency room, primarily for an upper respiratory viral infection. In December of 2008, A.C. returned but showed only slight congestion. And in January of 2008, a viral infection caused an exacerbation. None of these episodes lasted for at least two weeks; hence, none qualify for an extreme limitation.

The ALJ's decision also finds support in the opinions of the state agency physicians. As noted, in March of 2008, Dr. Mundra concluded that A.C.'s asthma was severe but did not meet or equal a listed impairment. Dr. Mundra also found that A.C. had some limitations in the area of health and general well-being but no significant limitations in any other domain. Soon thereafter, Dr. Downes, a pediatrician who also reviewed A.C.'s records, noted "less than marked" limitations in health and general wellbeing and no limitations in other domains. in June of 2008, Dr. Kwon concurred with the other assessments and, in July of 2008, Dr. Dialto indicated that A.C. had only "moderate persistent asthma" controlled by medication. These opinions, which are consistent with the reports of treating and examining doctors, also amount to substantial evidence. *See* 20 C.F.R. § 416.927(f). Accordingly, the court deems Plaintiff's first argument insufficient.

### 2. *Credibility*

■ Plaintiff's second argument concerns credibility. As the Commissioner notes, the only evidence at odds with the medical records was Plaintiff's testimony. Specifically, Plaintiff testified that A.C. suffered from frequent colds, infections and appetite disturbances and was, in general, not healthy. She also testified that A.C.'s asthma medications made him hyperactive and aggressive. Instead of focusing on these impairments, Plaintiff argues, the ALJ improperly questioned her at length about her smoking habits and her own claim for disability benefits.

The testimonial record reveals, however, that Plaintiff had the opportunity to fully explain A.C.'s condition and that it was not inappropriate for the ALJ to have explored Plaintiff's smoking habits, particularly in light of the medical advice received by Plaintiff that A.C. not be exposed to second-hand smoke. In addition, it was Plaintiff herself who raised the fact of her own disability, based in part, as it turns out, on asthma.[1]

More to the point, it is well established that a court must generally defer to credibility determinations made by an administrative law judge. *See Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987). As the First Circuit has long directed, "[i]n reviewing the record for substantial evidence, we are to keep in mind that [i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." *Rodriguez*, 647 F.2d at 222 (citation and internal quotation marks omitted). Moreover, as this court itself previously determined, this is no less true with regard to witnesses as to claimants. *See Rosado v. Barnhart*, 340 F.Supp.2d 63, 66 (D.Mass.2004) (address-

ing administrative law judge's credibility assessment of child's mother).

To be sure, the court must ensure, in appropriate cases, that an administrative law judge makes specific findings with respect to the "relevant evidence" when deciding to disbelieve a witness. *See Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986). Here, however, the court finds that the ALJ properly evaluated Plaintiff's credibility, weighing her testimony against the evidence of record. Thus, to the extent that Plaintiff's testimony indicated problems experienced by A.C. more extreme than those documented in the record—and that is doubtful—the ALJ appropriately discounted Plaintiff's reports given the absence of medical evidence supporting her testimony. In addition, if A.C.'s asthma was as severe as Plaintiff claims, it is only reasonable to conclude she would have not permitted smoking in the house. *Cf. Sexton v. Barnhart*, 247 F.Supp.2d 15, 23 (D.Mass.2003) (upholding administrative law judge's credibility assessment which included, among other things, the fact that the plaintiff continued to smoke despite asthma).

---

1. Upon being questioned by the ALJ, Plaintiff testified as follows:

ALJ: Do you smoke around [A.C.]?

WTN: I don't. I was trying to quit for four months, but I suffer from depression and it was very hard for me to do so. I don't smoke in front of him.

ALJ: Are you smoking now, ma'am?

WTN: Yes.

ALJ: Do you smoke every day?

WTN: Yes.

ALJ: How much do you smoke a day?

WTN: From 10 to 15 cigarettes.

ALJ: And it's your testimony that you don't smoke in your house ever?

WTN: I don't want to lie to you. Sometimes I do. But when I do, he is upstairs and I am downstairs. I do know that I have to quit because I suffer from asthma as well.

ALJ: So you've been told by doctors that he should not be exposed to smoke?

WTN: Yes, they have. . . .

\* \* \* \*

ALJ: Are you working, by the way?

WTN: No. . . . I don't work because I'm disabled since I don't know when. But I'm disabled.

ALJ: Are you receiving government payments for disability?

WTN: Yes.

ALJ: From the Federal government? From Social Security?

WTN: Yes.

ALJ: What is the reason that you're receiving those payments? Why are you disabled, in other words?

\* \* \* \*

WTN: Because of my asthma. I have chronic asthma. I also suffer from depression. . . .

(A.R. at 33–34.)

## IV. CONCLUSION

For the reasons stated, the Commissioner's motion to affirm is ALLOWED and Plaintiff's motion for judgment on the pleadings is DENIED.

IT IS SO ORDERED.